## The Serapis.

### Smith *v.* The Serapis.

#### (*District Court, D. Maryland.* December 4, 1891.)

1. Injury to Employe—Dangerous Appliances—Contributory Negligence.
   Libelant, a stevedore, lost his right hand by its being caught between the cogs of a steam-winch, which the court found to be dangerous and unsafe because of the nearness of the steam-valve to the cogs, and of the absence of casing over the cogs to prevent such accidents. Libelant knew the dangerous condition of the winch, and spoke of it to the mate of the vessel, but continued during part of two days to work the winch, unloading cargo out of the steamer's hold. *Held*, that the fact that libelant continued to work the winch with knowledge of the danger and risk did not of itself, as matter of law, bar his recovery in admiralty, but was evidence merely of contributory negligence on his part.

2. Same—Damages—In Admiralty.
   *Held* that, the libelant's contributory negligence being neither willful, gross, nor inexcusable, and the facts presenting a strong case for his relief, he should be decreed one-half the sum as damages which he would have recovered if he had been without fault.

(*Syllabus by the Court.*)

In Admiralty. Libel for personal injuries.

*J. Cookman Boyd*, for libelant.

*Convers & Kirlin* and *W. Benton Crisp*, for respondent, cited—

*Robertson* v. *Cornelson*, 34 Fed. Rep. 716; *Stringham* v. *Hilton*, 111 N. Y. 188, 18 N. E. Rep. 870; *Railroad Co.* v. *McDade*, 135 U. S. 554, 10 Sup. Ct. Rep. 1044; *Miles* v. *The Servia*, 44 Fed. Rep. 943; *The Maharajah*, 40

Fed. Rep. 784; *Coullard* v. *Tecumseh Mills*, 151 Mass. 85, 23 N. E. Rep. 731; *Tuttle*·v. *Railway Co.*, 122 U. S. 195, 7 Sup. Ct. Rep. 1166; *Townsend* v. *Langles*, 41 Fed. Rep. 919.

MORRIS, J. The libelant was one of a gang of stevedores employed in unloading a cargo of iron ore from the British steam-ship Serapis in the port of Baltimore. During the progress of the work he was assigned by the head stevedore to the duty of running the forward steam-winch. By the use of another winch the ore in buckets was being hoisted out of No. 2 forward hole, and the winch which libelant was attending was used to draw the crane to and from the wharf. He had to stand facing the winch, looking forward towards the bow of the ship, and was required for the proper performance of his duty to turn his head from time to time, to see the position of the bucket behind him, and to turn quickly and close or open the steam-valve by revolving a wheel in front of him with his right hand. While engaged at this work, and turning from looking back at the bucket, and having to take hold of the valve wheel, he put out his hand a little to far, and· it was caught between the cogs of the driving-wheel, directly in front of him. His hand was so crushed that he has permanently lost the use of it. Three fingers have already been amputated, with the probability that the remaining one will have to be taken off, leaving him only an almost useless stump.

The libelant seeks to recover for his injury upon the ground that the winch was dangerous to any one working at it to unload the ship, and that the negligence on the part of the ship-owners in having it in this dangerous condition renders them liable in this suit. The winch is of a kind called by some of the witnesses a "camel-back winch." The steam is controlled by a valve near the deck at the feet of the winchman, from which a valve-stem rises about three feet directly in front of him, on which is a wheel by which it is turned. As the winchman stands facing the winch, with his left hand on the reversing bar and his right hand on the wheel, the cogs of two wheels which drive the axle meet in front of his right hand. The distance between the circumference of the wheel and the nearest point of the cogs is differently stated by the witnesses. The libelant says that it was seven or eight inches, and several other witnesses called by him say it was from five to six inches. The testimony of the master of the ship is that the intersection of the cogs is 12 inches from the wheel, but he leaves it uncertain from what points his measurement was taken. The contention on behalf of the libelant is that the valve-wheel was nearer to the cogs than is usual in such winches, and that usually there is a covering or casing over the cogs to protect the winchman from accidents. There were no witnesses examined as to the construction of the winch, other than the stevedores·called by the libelant, and master and mate examined on behalf of the owners. The stevedores, who were all men of long experience, say that of such winches they have never seen one without a casing or cover over the cog-wheels; and some say that in other winches of this kind they have always found the valve-wheel higher; and at a greater distance from the cogs. The libelant says he had worked at a hundred different winches

on steam-ships, and that in all others the wheel was further from the cogs. He testifies as follows:

"I thought it was a queer apparatus. I said to the mate, 'You ought to have something over the cog-wheels.' The mate said to me, 'You be a little careful, and it will be all right.' I thought it looked dangerous to run, and thought if I spoke of it to the mate he would put something over the cog-wheels."

The libelant first ran the winch for four hours in the night-time, and the next day had run it for an hour and a half when his hand was caught. He testifies that he could not keep his hand on the valve-wheel and turn his head so as to see the tubs; that he was drawing in the slack chain by reversing the winch, and had turned to watch the tub, and was turning back to the winch to stop off the steam quickly, when, in placing his hand upon the wheel, he put it out a little too far, and it was caught. Another stevedore,—Tracy,—who was also running this winch the night before the accident, testifies that the mitten on his hand was caught in the same way, and taken off his hand. That he mentioned this to the donkey-engine man, in charge, and told him that it ought to have a cover on it; but the man only said, "Be careful."

From the testimony produced in this case I am unable to come to any other conclusion than that this winch was dangerous, and not proper to be furnished for work in which it had to be run continuously for hours by a workman who has to turn to see what is going on behind him, and has to start and stop it with great quickness. There is no testimony from which it can be inferred that the libelant was careless. Indeed, with the large open cogs undefended by any safeguard so near to his hand, it would seem that it would only be by good fortune that he could escape injury with the best attention his work permitted. Such a winch might be reasonably safe for hoisting an anchor, or raising sail, or any such short occasional use, in which the winchman could keep his eyes in front of him, with some one standing by to give him orders, but not for the continuous use which the work of hoisting out a cargo of ore requires. The testimony preponderates which goes to show that other such winches used for taking out cargoes have the cogs guarded, and that in this winch the man's hands had to be nearer to the cogs than is usual. Nothing ought to justify providing a machine so likely to maim the operator, except necessity arising from the difficulty of obviating the danger; and it is apparent that the danger can be obviated by an inexpensive casing, or by a very simple alteration by which the valve-wheel could be placed further from the cogs. The rule is firmly established that the employer is bound to see that the machinery furnished is reasonably safe and suitable for the purpose for which the employe is expected to use it.

The difficulty in the case arises from the fact that libelant saw and was aware of the defective construction of the winch, and the danger attending its use. It is contended by the ship-owners that the libelant, in going to work at it, entered upon a contract to work at that particular machine, with full knowledge of its defects, and that, therefore, he cannot recover. I do not think this statement quite fairly gives the sub-

stance of the transaction. The libelant, under the foreman of the stevedores, was employed generally to do any work usually done by stevedores in unloading a cargo of iron ore from a steam-ship. He knew nothing of the winch until his turn came to run it. He expected to find such a winch as was usual on such steam-ships, and reasonably safe. He spoke of its defect to an officer of the ship, but went on with his engagement as a stevedore, and ran it, exercising such care in its use as his duty permitted. This does not seem to me to amount to a contract to work at a defective winch, but rather to be a contract to assist in unloading the ship, with the incident that in the performance of that engagement the libelant continued to use a machine furnished to him which he knew to be dangerous after the employer had declined to alter it. At common law, under such facts, it could scarcely be contended that the libelant was entitled to recover. At common law, if his employer was guilty of negligence in furnishing him with an improper machine not safe to use, then, in knowing it was unsafe, he used it, he was guilty of negligence also, and his contributory negligence would, as a matter of law, bar his recovery. In admiralty this is not the rule. Contributory negligence does not of itself necessarily bar recovery, but leaves the court at liberty to apportion the damages upon principles of equity, and to hold the ship-owner liable for part of the employe's pecuniary loss. *The Max Morris*, 137 U. S. 1, 11 Sup. Ct. Rep. 29; same case in the district court, 24 Fed. Rep. 860, and in the circuit court, 28 Fed. Rep. 881.

The question whether using machinery known to be defective or dangerous absolutely bars recovery of itself, or is only evidence tending to show contributory negligence, is not without decisions both ways. In common-law cases it is most frequently of no importance how it is regarded, for whether the use by an employe of a machine with knowledge of its dangerous defects is held to be a contract by him to assume the risk of all danger from it, or is held to be evidence of contributory negligence, the employe is equally without remedy. But even at common law, since the general adoption of machinery driven by steam, the injuries from which are so severe, the rule that the employe is to be deemed to have assumed the risk of all danger by continuing to use such machinery with knowledge of its defects has been declared to be subject to very many exceptions. The tendency of the decisions is to harmonize those exceptions by adopting the principle that the conduct of the employe is to be judged by all the circumstances which go to show whether or not, under all the circumstances of his employment, a reasonably prudent man would have continued in the employment with the knowledge of the danger which the employe had; that is to say, was his conduct reasonably prudent, or was it negligent and reckless? In Sherman and Redfield on Negligence (sections 208, 209) this is stated to be the result of the more modern adjudications. Section 208 is as follows:

"The exemption of the master from liability to servants for injuries caused by defects which the servants knew or ought to have known is founded solely upon the general law of contributory negligence, and therefore the liability of a master in such cases must be determined by reference to that law."

The proper rule for the guidance of the admiralty courts of the United States, where there is contributory negligence in cases of marine torts, has been authoritatively settled by the supreme court in *The Max Morris, supra*, affirming the rulings of Judge BROWN in the district court for the southern district of New York, and of Judge WALLACE in the circuit court. The very question of the effect of contributory negligence in a similar action for personal injuries was certified to the supreme court, and, in answering, Mr. Justice BLATCHFORD, speaking for the court, said:

"Contributory negligence in cases like the present should not wholly bar recovery. There would have been no injury to the libelant but for the fault of the vessel; and while, on the one hand, the court ought not to give him full compensation for his injury, when he himself was partly in fault, it ought not, on the other hand, to be restrained from saying that the fact of his negligence should not deprive him of all recovery of damages. As stated by the district judge in his opinion in the present case, the more equal distribution of justice, the dictates of humanity, the safety of life and limb, and the public good will be best promoted by holding vessels liable to bear some part of the actual pecuniary loss sustained by a libelant in a case like the present, where their fault is clear, provided the libelant's fault, though evident, is neither willful, nor gross, nor inexcusable, and where other circumstances present a strong case for his relief."

This libelant has, in my judgment, made out such a case. He, a sober, industrious, skillful workman, 33 years of age, has lost his right hand in the service of the owners of this steam-ship. He has lost it because, notwithstanding his fears with respect to the danger, he consented to use a machine which was a permanent equipment of this ship, and furnished by them as safe and proper for his use, but which, upon the evidence, I find was unsafe and dangerous, and which, it is apparent, could without difficulty have been guarded by them so as to have been safe and suitable. It is not just that the ship-owners should provide such a machine, and throw all the risk of using it upon the unlucky workman who may chance to be injured by it.

I have held this case for some time under advisement, for, although at the hearing I was of opinion that the decisions cited by counsel for the owners applied to the facts of this case would bar any recovery by the libelant, the hardship of this result was such as to lead me to hesitate and to doubt its correctness. A careful reconsideration has brought me to the conclusion that the libelant, having brought his action in admiralty, is entitled to have applied to it, not the rules which would control it at common law, but those which accord with the now recognized principles which are to govern our admiralty courts in dealing with marine torts. I am aware that learned and experienced judges have in quite similar cases held differently. The case of *The Maharajah*, 40 Fed. Rep. 784, is a strong case in favor of the contention for the steamer, but in the present case the evidence that the winch was unusual and unfit is fuller, and notice was given of its defect. Moreover, the decision in the *Maharajah Case* was rendered before the supreme court had fully sanctioned the equitable ruling of the same learned judge in the case of *The Max Morris*.

The amount claimed by the libelant as compensation for his injuries is $3,000. If the steam-ship had been solely in fault this would be a reasonable claim. I shall divide this amount, and award him $1,500.

The only testimony on behalf of the steam-ship is the depositions of the master and mate, taken at Beaufort, S. C., to which port the steamer had gone for a cargo. The depositions were taken on September 22d, under a notice served on libelant's proctor, in Baltimore, on September 19th. This was not a reasonable notice, as it did not allow sufficient time for the libelant to be represented at the examination and to cross-examine the witnesses. The depositions were returned to this court and opened on September 25th, and upon motion of the libelant's proctor the hearing of the case was set for October 22d. The motion to suppress the depositions was not made until the hearing. Under the circumstances, I hold that the motion to suppress was made too late, and I have considered the depositions. The testimony of the master and mate is very guarded and formal, and not sufficient to affect my mind on the question of the unsuitableness of the winch for the purpose to which it was put. I will sign a decree for $1,500 and half the costs.