## THE S. C. HART.

### (District Court, D. Massachusetts. October 7, 1904.)

#### No. 1,520.

1. TOWAGE—CONTRACT—IMPLIED DUTY TO PROTECT TOW.

　　Respondent contracted to tow libelant's lighter, which was without motive power, from New Bedford to Westport Harbor in Buzzard's Bay; and, while it was stated that the tug could not take it inside the harbor, it was to be brought to the bar outside. It was known that it was to be used on the inside, and it could only be taken in by warping when the tide was favorable. It was left by the tug some distance outside, without any directions to those in charge as to the entrance, which was not visible; and, the tide being unfavorable and the wind rising, they were unable to make any headway, and it was finally wrecked on the beach. *Held*, that it was the duty of the tug under its contract not to leave the lighter in a dangerous place, but in the best situation for it to cross the bar and enter the harbor, and that it was liable for its failure to perform such duty, the master of the tug in fact having no knowledge of the locality and no pilot; that the libelant was also responsible for a part of the damages, because of the insufficiency of the lighter's crew, who, if experienced, might have saved it.

In Admiralty. Suit against tug for loss of tow.

Crapo, Clifford & Prescott, for libelant.

Carver & Blodgett, for libelee.

LOWELL, District Judge. This is a libel against the tug S. C. Hart to recover for the loss of the lighter Eva, wrecked on Horseneck Beach, near Westport Harbor, November 9, 1903. Within the small landlocked harbor there is a shoal styled on the chart the "Lion's Tongue," a part of which is known locally as the "Bar." In the "List of Beacons, Buoys, and Daymarks" it is called the "Middle Ground." Outside the harbor is a sand reef or shoal between red buoy No. 4 (Half Mile Shoal Buoy) and Half Mile Rock. This is often locally called the "Shoal." It appears to be one of those shoals, generally known as bars, which are formed by the current just outside a sandy harbor. The black buoy marks Dogfish Ledge, and not this bar. It is about 1,000 feet outside the latter. Westport Point is a mile or two up the Westport or Acoakset river, a salt creek which flows through Westport Harbor into Buzzard's Bay.

　　The lighter was at New Bedford. Taylor, its owner, wished to use it in the construction of a bridge over Westport river between Westport Point and Horseneck Beach. He applied for towage to the New Bedford Towboat Company, the owner of the Hart, and was told by Capt. Sherman, the company's manager, that the tug would not carry the lighter over the bar. There is conflict of testimony if Sherman added that he would leave the lighter between or just outside the red and black buoys. On his direct examination he said that he told Taylor that the tug would anchor the lighter just outside the red and black buoys. On cross-examination he carefully repeated the conversation without reference to the buoys. Taylor said there was no mention of the buoys, and I am inclined, on the whole, to believe him, notwithstanding the testimony of Pierce and Athearn, which may well re-

produce what Sherman told Pierce, the master of the Hart. Sherman would hardly have made specific mention of two out of many buoys in a place he had visited but twice, without referring to a chart, and he says he did not refer to a chart while talking to Taylor. Taylor testified that Sherman said the tug would give the lighter a push over the bar. This was not contradicted very specifically, and I rather think the promise was made either by Sherman or by Pierce. Taylor had little knowledge of the sea, and knew nothing of Westport Harbor, except what he had seen in one or two visits to the place overland. To one unfamiliar with the sea, a view of it from the land tells almost nothing; but in one of these visits Taylor unfortunately had heard of the bar first above mentioned, hereinafter called the "Inner Bar," and had this in his mind while talking to Sherman. On the other hand, Sherman, a mariner of long experience, who had been into Westport Harbor but twice in his life, intended to speak of the second bar above mentioned, hereinafter called the "Outer Bar," having no knowledge of the peculiar local nomenclature. The names "Outer Bar" and "Inner Bar" are used in the United States Coast Pilot. Thus there arose a serious misunderstanding, quite honest on the part of both men. Taylor asked Sherman if he wanted a pilot. Sherman said he did not, having in mind the Outer Bar. Sherman asked Taylor if he had good ground tackle, and Taylor answered that he had, supposing that he was to be left in a landlocked harbor. Under this supposition he urged a speedy departure, but Pierce told him that the start from New Bedford must be made in the morning, so as to have daylight to enter the harbor.

On November 9th, at about 6 o'clock in the morning, the tug started with the lighter in tow. The weather was pleasant, and the wind light. Taylor went to Westport overland. The lighter's crew consisted of an engineer, who had general charge, though he knew nothing of the sea, two landsmen, if possible more ignorant than the engineer, and two seamen, Anderson and Mooney; the former having followed the sea for 25 years. In answer to the question, "You knew as an actual fact that you didn't know anything about the sea, anything about how a vessel ought to be anchored?" the engineer replied, "About as much as a lot of old females would." The engineer had accompanied Taylor on one of his visits to Westport. The others knew nothing of the place. The tug arrived off the mouth of the harbor between 11 and 11:20 a. m., anchored the lighter, and then proceeded to another job.

The precise place at which the tug left the lighter is in dispute. The libelant's witnesses placed it on a line between the black buoy above mentioned, and Two Mile Rock, nearer the latter. Capt. Pierce, of the Hart, said it was about 150 feet outside the black buoy. Capt. Macomber, an excellent witness, put the position about midway between the ledge and the rock. The inference to be drawn from the attempts made to warp the lighter is not clear, though it does not support the libelant's extreme position. The heaviest anchor left the ground but once (according to Mooney) or twice (according to Anderson). The smallest anchor used for warping must have been carried out nearly to windward, inasmuch as the lighter's engine took in on both hawsers at the same time, and the heavy anchor could have been

lifted only when the lighter was over it. It should seem that the resultant direction of the lighter's warping and drifting must have been nearly to leeward, though the changing tide and other conditions leave this inference rather weak. On the whole, and while it is not possible to be exact, I am satisfied that the tug left the lighter some distance south of a line drawn from the black to the red buoy, and still further to the south of the outer bar, which extends from the red buoy to Half Mile Rock. Having done this, Capt. Pierce deemed that he had performed his contract, and he went away without much notion how the lighter was to get into the harbor. This is made plain by his ignorance whether the tide was running out or in. The lighter could warp in only during flood tide. In fact, the tide was high about noon.

At the time the lighter was anchored there had arisen a strong southwesterly breeze, which increased irregularly through the afternoon into the evening  It was hardly a gale, but outside the harbor there is no protection from the Atlantic, and there are many rocks on which the sea was then breaking. The entrance to the harbor is narrow and unusually obscure, close to Horseneck Beach, the lee shore. It was probably quite hidden from the lighter's anchorage, and those on board did not know precisely in what direction it lay; a confusion which will not seem unnatural to one familiar with the place. In answer to the engineer's question, Capt. Pierce waved his hand toward the north just before steaming out to sea. He had looked at the chart before he left New Bedford, and he said that he saw the opening between "the bluff" and Horseneck Beach; but this he could not have seen from the black buoy, or from any point within 150 feet of it. Moreover, Half Mile Rock appears most embarrassingly in the way. See testimony of Mooney.

In the time remaining before high water, less than an hour, I think the lighter could not have been brought into the harbor, even by the most experienced men. The distance to be warped was half to three-quarters of a mile. There was a choppy sea, not very heavy, indeed, but enough to embarrass the handling of a 200-pound anchor in a 12 or 14 foot skiff. A 40-foot derrick stood at one end of the lighter, adding to its roll and pitch. Precisely what was done on the lighter, and in what order, does not plainly appear from the testimony of those on board. Sometimes the anchors held; sometimes they did not. Sometimes an attempt to warp succeeded in part; sometimes ground was lost in the attempt. At about 5:30 p. m. Taylor arrived, and found the lighter in the breakers. It lay too near Horseneck Beach to avail itself of the change of tide between 6 and 7 o'clock. At about 9 o'clock it dragged ashore.

This libel may be taken as founded upon a contract or upon a tort. Either way the result will be much the same. As has been said, there was no meeting of minds upon the terms of an express contract. At the argument it was practically conceded that the libelant cannot hold the claimant to a contract of towage to the Inner Bar. The "Bar" must be taken to be the Outer Bar. This is the ordinary use, which a limited local use cannot overcome, especially as it appears from the testimony that seafaring men from Westport sometimes spoke of the Outer Bar as a bar. See testimony of Macomber. But the claimant's

undertaking, though misunderstood by the libelant, created an implied contract of which the libelant can now avail himself. This undertaking was not merely to tow the lighter to a spot in Buzzard's Bay somewhat vaguely designated, and there to leave it. Sherman knew that Taylor wished the lighter to be towed into Westport Harbor, and, if that was impossible, then to be put in a place from which it could most easily enter the harbor by itself. He undertook to tow the lighter to Westport Harbor, subject to the qualification that the tug should not be required to cross the bar. As to the method of entrance, the control was still in part with the tug. An ordinary contract of towage to Westport Harbor would call for delivery of the lighter by the tug safe inside. The method and precise place of entrance would be at the discretion of the tug. A contract of towage to Westport Harbor, limited by reason of the tug's supposed inability to cross the bar, required the tug to place the lighter in the best situation to cross the bar unaided. This was not a sailing vessel, with its own means of progression, but a lighter, able to move itself only under favorable conditions, and at the best slowly and with imperfect control. Had a squall been raging when the tug arrived off Westport, the tug could not properly have gone away and have left the lighter to its fate, however accurately it had placed the latter upon the spot mentioned by Sherman. If, at the time of arrival off Westport, there was danger in leaving the lighter at anchor outside the harbor, the tug should have taken the lighter back to New Bedford, or to some other place of safety. The tug failed in its duty if it left the lighter in any place from which, under the circumstances, there was not reasonably safe access to the harbor. Such was not the place where the lighter was anchored. It was not shoved across the bar between Red Buoy 4 and Half Mile Rock. It was not even left on a line between the red and black buoys, but considerably to the south of this line. The tug was bound to deliver the lighter at a convenient time of tide, and the lighter was left without regard to the tide. Though the tug was not itself to enter the harbor, an accurate knowledge of the entrance by the tug's captain was necessary. The United States Coast Pilot states that "strangers entering the harbor take a pilot, lying off and on eastward of Two Mile Rock." Rather more knowledge was needed to leave the lighter at the spot most convenient for its unaided entrance than to tow it into the harbor. I do not think Capt. Pierce had this knowledge. I doubt if any captain, however skillful, be fitted to place a lighter at the best advantage for entering Westport Harbor who has never seen the place before; and from the ordinary course of vessels in Buzzard's Bay nothing can be seen of Westport Harbor, even with a good glass. While no pilot is needed to bring a tug on a pleasure excursion to the bar, I rather think one was needed for the Hart's undertaking. I find the tug to blame for the accident, inasmuch as the lighter was left in a place of danger.

It remains to consider if the lighter also was at fault. Had Taylor's understanding been correct, and had the tug delivered the lighter inside the harbor, the latter would have been safe under any circumstances. But the tug could and did rely upon the lighter's ability to enter the harbor unaided from any place in which the tug was justified in

leaving a lighter like the Eva, properly equipped and manned. The Hart's undertaking to tow was limited by this condition. The claimant contends that the Eva's ground tackle was insufficient and the crew wanting in skill. The Eva's ground tackle was reasonably sufficient. In demanding heavier tackle, Capt. Gibbs and Capt. Sherman were plainly thinking of the needs of very different craft. The sufficiency of the crew is a more doubtful matter. No one of them knew Westport Harbor or the way to enter it. To warp into Westport Harbor from the Outer Bar, even under the most favorable conditions, required considerable skill and knowledge. If the tug needed a pilot, so, I think, did the lighter, though the same pilot would have answered for both. Such nautical skill as existed on the lighter was found wholly in two members of the crew, not at all in the engineer who was in charge. While I doubt if skill and experience would have saved the Eva, this is by no means unlikely; and the confused and contradictory report of what happened on the lighter itself strongly suggests ignorance and blundering. The failure to protest against the departure of the Hart makes for the same conclusion, though it may be explained in part by a supposition that the Hart was about to fasten to the Eva alongside.

Damages divided.