## J. T. MORGAN LUMBER CO. v. WEST KENTUCKY COAL CO.

(District Court, W. D. Kentucky. May 20, 1910.)

1. TOWAGE (§ 4*)—RELATION AND DUTIES OF TUG TO TOW—LOSS OR INJURY TO TOW.

One undertaking a towage contract is not a common carrier nor liable as such, but his obligation is to perform the service with the reasonable care and skill which a prudent and experienced person should use under similar circumstances, and beyond this he is not responsible.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 4; Dec. Dig. § 4.*]

2. TOWAGE (§ 15*)—ACTIONS—DIVISION OF DAMAGES.

The rule in admiralty for the division of damages is not limited to cases of collision, but may be applied in any case where a loss results from the fault or negligence of both parties, and without regard to the issues raised by the pleadings, if it appears from the record to be required to meet the ends of justice.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 38; Dec. Dig. § 15.*]

3. TOWAGE (§ 12*)—BREAKING OF LOG RAFT IN TOW—LIABILITY—FAULT OF BOTH PARTIES.

Libelant company had a raft of logs moored in the Tennessee river near its mouth, which became endangered by a rise in the river, and libelant employed respondent to tow it to libelant's lumber mills located on the Illinois side of the Ohio. Two tugs were used which safely took the raft across the Ohio, and proceeded down toward the mills. It was necessary from the position of the raft on that side of the river to pass around some piling before reaching the mills, and the tugmasters deemed it dangerous at that time, owing to a strong wind from the Illinois side, and proposed to tie up the raft until the wind abated, but to this libelant's president, who was on board, refused to consent, and insisted on landing at the mills, promising to supply the necessary lines. He fur-

nished wire cables, and, owing to their inelasticity and the force of the wind, the raft was broken in landing, and some of the logs were lost. *Held*, under the evidence, that the tugs were not negligent in the manner of handling the tow, but were in fault for not tying the tow up in accordance with the judgment of the masters, notwithstanding the objection of libelant's president; that libelant was also in fault because of its interference through its president and the improper ropes furnished, which acts were the proximate cause of the loss; and that the damages should be divided.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 24–26, 29; Dec. Dig. § 12.*]

In Admiralty. Suit by the J. T. Morgan Lumber Company against the West Kentucky Coal Company. Decree for libelant for half damages.

Bagby & Martin and Campbell & Campbell, for libelant.
Wheeler & Hughes, for respondent.

EVANS, District Judge. The court finds the facts in this case to be as follows: The libelant, which manufactures and sells lumber, had a large raft of logs moored in the Tennessee river not far from its junction with the Ohio. A very rapid rise in the Tennessee put the raft in peril, and made it necessary that it should be promptly removed, and on February 20, 1909, the libelant contracted with the respondent to make the removal with its steamer Harth at the usual price of $2.50 per hour for the time consumed in the work. Though the libelant asserts to the contrary, there was in fact no agreement that the raft should be divided and removed half at a time. The contract was to tow the raft to Brookport, Ill., and there to land it. The Harth attached itself to the raft, and, the difficulties proving to be considerable, the steamer Kuttawa was engaged to assist the Harth, and the Kuttawa also attached itself to the raft. Both steamers fastened themselves very close to the raft and behind it; the idea of the master of the Harth, who was in command, being to push the raft in front of the steamers, instead of placing the steamers in front of the raft and pulling it by means of tow-lines. The Ohio river between Paducah and Brookport is divided by an island known as the Towhead; the main channel being on the Kentucky shore. The waters of the Tennessee are naturally turned to the left by those of the Ohio when they meet, and are thus forced westward along the Kentucky shore. Owing to the rapid rise of the Tennessee, there was on the Kentucky shore a great accumulation of water, and the master of the Harth deemed it wiser to avoid the mass of water thus forced upon that shore by steering from the Tennessee directly out into the Ohio, and by passing to the right, instead of the left, of Towhead Island to get into the minor channel on the Illinois shore, and in that way proceed towards Brookport, Ill., where the libelant's mills were situated. Brookport is a place about a mile and a half below the city of Paducah, and the river between them is quite wide. The steamers with the raft in tow got safely into the quieter waters of the minor channel on the Illinois side of the river, and which does not appear to have been then much

affected by the water from the Tennessee. Just above the landing at Brookport, the Illinois Central Railroad Company has extensive piles extending out into the river which constitute a material part of its large ferry and traffic facilities for transferring its business from the north side of the Ohio to Paducah, Ky., and points south, and vice versa. The landing at Brookport was almost immediately below those piles. When the Harth and the Kuttawa, with the raft in their front, approached the piles, the captains of the two boats united in informing J. A. Morgan, the president of the libelant, who was on the Harth, and accompanying the tow, that as the wind was blowing hard from the Illinois shore, and as it was late in the day, it would not be safe on that day to attempt to make a landing at Brookport below the piles, but that it would be better and safer to put into the Illinois shore in the "pocket" above the piles where the raft would be safe for the night, and insisted that this course should be pursued. The president of the libelant refused to agree to this, and, stating that he would take the responsibility, directed the landing to be made at Brookport on that day, saying that he would get on libelant's gasoline launch, which was then approaching from Brookport, and would go ahead and make all necessary arrangements for cables and ropes, of which he declared there was an abundant supply at libelant's mills at Brookport. Morgan, the president, soon afterwards boarded the launch which had come for him. Acting under these directions of the president of the libelant, the steamers undertook to land the tow at Brookport, but were unable to do so, owing largely to the wind that blew from the Illinois shore. However, they came close enough in for very long ropes furnished and brought out by the libelant to be attached by its men to the raft, but, as the ropes were wire and would not "give," they pulled the raft apart, and a large proportion of the logs which composed it were lost. The libelant expended $150 for ropes in its subsequent efforts to save the logs, and in the course of those efforts it used the steamer Morgan, one of its own boats, and a derrick boat which it hired, for a period of 18 days, and in that way saved a large proportion of the logs which had been cast away when the raft was broken up. The value of the services of this steamer and derrick boat for 18 days, though not very satisfactorily proved, the court finds was $35 per day, a total of $630, which sum the court finds was the reasonable value of the services of the boat and crew for that period, and this sum, added to $150 paid out for ropes, makes a total of $780 expended by the libelant in its efforts to save the logs. The logs which made up the raft were cut from libelant's lands located up the Tennessee river, and no very satisfactory testimony was offered as to their value there or as to the cost of getting them to Paducah. They were in large measure oak logs, but the testimony shows that a considerable proportion—about one-third to one-half—of such rafts must be of light and cheaper timber (such as. gum, poplar, etc.) to enable the raft to float at all; a raft made up exclusively of heavy timber like oak being certain not to float very long. In the raft were 1,604 logs. Of that number 1,122 were saved, and 482 were lost. Those lost contained 96,400 feet, and we find, all things considered, that the value of it was $15 per thousand feet, or a total value of $1,446, which,

181 F.—18

added to the expense of the salvage, namely, $780, makes a total loss of $2,226. The libelant claims that the logs lost were worth more than $15 per thousand feet, but the court does not so find from the testimony.

The libelant bases its claim to recover the loss from the respondent upon the assertion that the latter was negligent, first, in not dividing the raft into two parts before undertaking to remove it; second, in attaching the steamers to the rear of the raft; third, in not attaching the raft to the steamers by tow lines of considerable length, so as to permit the floating of the raft at a safe distance from the sterns of the steamers; fourth, in not taking the Kentucky shore after getting into the Ohio river; and, fifth, in not using due care in making the landing at Brookport. In cases like this negligence is the failure to use the reasonable care and skill which a prudent and experienced person should use under similar circumstances. The respondent, when it undertook the towage of the raft, became bound to transport it to Brookport, and safely to land it there, if by the use of all reasonable care and skill it could do so, though it did not become bound to land the raft on February 20, 1909. But, although the libel avers and the answer admits that the respondent was a common carrier, that as matter of law was not true, nor are the liabilities of a common carrier those which were incurred by the respondent under the towage contract in this case. The policy of the law forbids the conclusion that a contract for towage imposes the obligations of a common carrier or makes the person engaging to do the towing an insurer of the safety of the thing towed. This was definitely settled by the Supreme Court in the cases of The Syracuse, 12 Wall. 176, 20 L. Ed. 382, and The Margaret, 94 U. S. 496-7, 24 L. Ed. 146. Many other cases have followed this ruling. Would a prudent and skillful person have divided the raft before starting on the voyage when the Tennessee river was rapidly rising, is a question upon which the testimony is conflicting. It might depend upon whether the flood in the river made immediate removal imperative. Should the steamers have preceded the raft, towing it by long lines attached thereto, or was it better to lash the boats and the raft close together, the latter in front, so that it could be pushed towards the Illinois shore, are also questions upon which the expert witnesses radically differed. The captain of the Harth thought the latter was the better course under the circumstances—that is to say, better to get behind the raft and push it across the Ohio and directly up to the landing at Brookport, and, when that landing was approached from above, to allow the steamers again to put their sterns towards the middle of the stream when they got opposite the landing, and then to flank the raft in to the landing—and several experts testified in support of the wisdom of the course pursued by the steamers. Probably a greater number of the experts testified that the other course would have been better, and but for the immense flow of water out of the Tennessee river at the time and when it was rapidly rising we should say that probably it would have been better seamanship to have adopted the other course, namely, to have put the steamers in front with towlines of some length attached to the raft, and to have followed the Kentucky shore until the steamers could have proceeded directly across the Ohio

to the Illinois side to a point which would put them below Brookport, and then to have effected a landing there by heading upstream, and allowing the current to float the raft in to the shore by the time the steamers got to the landing.  But the wisdom of this course may have depended upon the conditions on the Kentucky shore at the time, and it may be that the flood there produced by the sudden oncoming of the water from the Tennessee might have rendered that course less wise than the one actually pursued by the captain of the Harth who was an old and experienced steamboat man, and thoroughly acquainted with the rivers near Paducah, alike in their ordinary and in their extraordinary stages of water.

But we think these matters need not be very especially considered, because, in fact, the steamers towed the raft in perfect safety past the Towhead Island and near to the Illinois shore and near to Brookport. However towed, the raft was perfectly safe until the attempt was made to land it, and it is what occurred on the Illinois side of the river that has claimed the very careful consideration of the court.  Without going into details, we think the steamers were in fault in trying to land on that day instead of taking the raft into the pocket or eddy above the piles, and there awaiting the return of daylight and a change or a cessation of the heavy wind that was blowing off the Illinois shore. The respondent, through its agents, had supreme control of that much of the situation (Transportation Line v. Hope, 95 U. S. 300, 24 L. Ed. 477), and it was hardly the exercise of due care and skill not to have controlled it even in the face of libelant's directions.  And it may possibly be that the steamers were in fault also in remaining too close to the Illinois shore after passing Towhead Island and the piles instead of taking more sea room and thus be enabled to approach the landing head on.  On the other hand, we are clear in the opinion that the owner of the raft was in even more fault when, through its president, who accompanied the tow, it interfered and directed the steamers to make the landing that afternoon at Brookport, and when later on it of its own volition so attached wire ropes to the raft as to break it to pieces.  These acts upon the libelant's part appear to have been the proximate causes of the disaster, without which it might not have happened, and were less excusable if, as some of the testimony tended to show, the raft was in bad condition when in the Tennessee.

However, as both parties were in some fault (the comparative degrees of which we need not consider), the only remaining inquiry is whether this is a case for dividing the loss.  True this question is not in terms raised in the pleadings, but as it can cause no surprise in the legal sense, in view of the cases we shall cite below, in the language of the Supreme Court in The Syracuse, 12 Wall. 173 (20 L. Ed. 382), "it is the duty of the court to extract the real case from the whole record and decide accordingly."  The liberal rules of practice in admiralty cases allow this.  For a long time almost every important case where such a division was adjudged was the simple one of collision, but in The Max Morris, 137 U. S. 1, and especially in what was said on page 14 of the report (11 Sup. Ct. 29, 34 L. Ed. 586), the Supreme Court so broadened the rule as clearly to make it applicable to this case.  Since that decision the courts have applied the rule in many cases other than

those of collision, for example it was so applied in The Frank and Willie (D. C.) 45 Fed. 494; The Nathan Hale (D. C.) 48 Fed. 698; The Julia Fowler (D. C.) 49 Fed. 277; The Serapis (D. C.) 49 Fed. 393; The J. & J. McCarthy (D. C.) 55 Fed. 85; The Cyprus (D. C.) 55 Fed. 332.; Vessel Owners v. Wilson, 63 Fed. 626, 11 C. C. A. 366; Smith v. City of Shakopee, 103 Fed. 240, 44 C. C. A. 1; The S. C. Hart (D. C.) 132 Fed. 536.

We therefore conclude that the libelant is entitled to recover from the respondent one-half of the loss, namely, $1,112, with interest from this date until paid. The costs of the action are also adjudged to the libelant.