EDGERTON v. THE MAYOR, etc.[1]

*District Court, S. D. New York.   April 5, 1886.)*

1. COLLISION—OPEN DRAW—VESSEL APPROACHING AT ANGLE—FAULT.
    When a tug, with a float, attempted to pass through a draw-bridge on the Harlem river, but did not approach the draw in line with the opening, and the pilot-house of the tug struck the end of the draw, *held*, that the tug was in fault.

2. SAME—ENGINEER OF DRAW—DUTY—CONTRIBUTORY NEGLIGENCE.
    The engineer of the draw perceived that the tow was approaching upon an angle, but made no effort to favor its passage by revolving the draw beyond the middle line, as was the custom to do when necessary. *Held*, that failure, to perform this simple and customary duty was contributory negligence on the part of the engineer.

3. SAME—CITY CORPORATION—DEPARTMENT OF PARKS—STATE COURT ADJUDICATION.
    The state courts having held that the corporation is liable for any negligence in the management of streets or bridges under the department of parks, such adjudication should be followed by this court.

4. SAME—DRAW-BRIDGE—DUTY OF CUSTODIANS—NEGLIGENCE OF SERVANT—LIABILITY.
    The duty to take proper care of a bridge includes the duty to make proper provision for the passage of vessels through the draw. The custodians of the bridge are bound to the use of ordinary diligence to avoid accidents to vessels going through the draw in a customary manner, as one of the incidents of the management of the bridge. They are therefore responsible for the want of ordinary care on the part of their servants.

In Admiralty.

*Alexander & Ash*, for libelant.

*E. H. Lacombe* and *F. W. Hinrichs*, for respondents.

BROWN, J. At about 8:30 A. M. on the twenty-fourth of February, 1884, as the steam-tug James A. Langton, having float No. 4 lashed on her starboard side, was going up the Harlem river with the flood-tide, in attempting to pass through the eastern passage of the open draw of the Third-avenue bridge the pilot-house of the tug struck the

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

corner of the draw, causing various items of damage, for which this libel was filed. The tug was about 70 feet long by 19 feet beam; the float, 190 feet long by 34 feet beam. The bridge is 55 feet wide. The whole span of the draw, which revolves on its center so as to open two passages for vessels, is about 212 feet long; and when it is fully open, each passage-way for vessels is $78\frac{1}{2}$ feet in the clear. The abutment on the New York side is 134 feet long; that on the Westchester side, 212 feet; making the whole length of the bridge 490 feet. The whole width of the tug and tow was about 53 feet.

The libelant contends that the draw was not open by some 10 or 15 feet, and that that was the cause of the collision; that he came up the river in line with the east passage, and headed directly through it; and that the float went within three or four feet of the Westchester side. The respondents' witnesses allege that the draw was open exactly true; that the tug and float came up along the westerly or New York side of the river, and appeared to be designing to go through the west passage of the draw; but that when near the bridge they sheered to the eastward, attempting the east passage, and thus threw the boats quartering upon the corner of the draw, rendering the collision inevitable.

I am satisfied that the truth lies between these two accounts. It would have been impossible for the tug, if heading for the western passage, when within 250 or 300 feet of it, as the respondents' witnesses allege, to have turned so cumbersome a float 134 feet to the eastward, so as to enter the eastern passage at all. The tide was running flood at the rate of some three miles an hour, and the boat, though under a slow bell, must have had some considerable headway, or she could not have been steered at all, nor have crossed from one passage to the other. A disinterested witness, standing on the dock about 700 feet below the bridge, testified that the tug and float seemed to be about in mid-river, heading for the east passage. The east passage, however, was from two-thirds to three-fourths of the distance across the river; so that if this witness' statement is to be accepted, the tug and float were not heading directly up river, but must have been heading to the eastward, so as to reach and pass through the eastern passage. To this extent the evidence of the respondents is therefore partially corroborated, although the distance was much greater than they state. The east passage was some 25 or 26 feet wider than the tug and float. Had they been heading from below in a straight line for the east passage, and gone, as the captain says he did go, within three or four feet of the east abutment, they would have cleared the other side by over 20 feet, and the corner of the draw must have been nearly 25 feet less than fully open in order to have struck the pilot-house,—a distance nearly double the distance estimated by the libelant's witnesses.

From these considerations I am satisfied that the tug and float did not approach the draw in line with the opening, as they might and

should have done; but that they approached it somewhat upon an angle, and must be held in fault for doing so when nothing constrained them.   The tide there flows about true, and they could not have been deflected by currents.

On the part of those in charge of the bridge, it is clear from the evidence that they had abundant notice of the approach of the tug, and abundant time to give her all available space.   The engineer thinks that he had the draw open one or two minutes before the collision.   He saw she was coming upon an angle, but made no effort to favor her passage by revolving the draw beyond the middle line, as he testifies it was the practice to do when necessary.   The open draw extended some 79 feet down the river.   There were no guards beneath of any kind to protect vessels approaching it, such as exist in many cases.   Reasonable consideration for the safety of vessels going through such a passage, where the tide is so strong, would seem to demand that such guards should be constructed corresponding with the open projection.   But, without determining that point here, it seems clear that where no such guards exist, and where the tide is strong, and the vessel is seen approaching upon an angle, and likely to hit the edge of the draw if it be not moved, ordinary care demands that the draw be moved further in order to avoid accidents. The evidence shows that there was abundant time to do this, and that it might have been done with the utmost ease.   Failure to perform this simple and customary duty must be held contributory negligence on the part of the engineer.   The mode of collision shows that had the draw been moved a few feet further the collision would not have taken place.   Both parties, upon the facts, must be held to have contributed to the collision; and the libelant is therefore entitled to one-half of his damages and costs, provided the corporation respondent is answerable for the neglect of the engineer to open the draw further.

2. I deem it unnecessary to consider here the somewhat nice distinctions which have been made in the several cases decided in the court of appeals in this state as regards the liability of a city corporation for the negligent acts of the servants employed under its different heads of departments as constituted by law.   As respects negligence by the employes of the department of public charities and correction, of the fire department, and of the board of education, it has been adjudged that the corporation is not liable.   *Maximilian* v. *Mayor, etc.*, 62 N. Y. 166; *Smith* v. *City of Rochester*, 76 N. Y. 506; *Ham* v. *Mayor, etc.*, 70 N. Y. 459.   The first of these cases was followed by this court in the case of *Haight* v. *Mayor, etc.*, 24 Fed. Rep. 93.   In the same case, however, FOLGER, J., says, page 170:

"The duty of keeping in repair streets, *bridges*, and other common ways of passage, and sewers, and a liability for a neglect to perform that duty, rests upon an express or implied acceptance of the power, and an agreement so to do.   It is a duty with which the city is charged for its own corporate benefit, to be performed by its own agents, as its own corporate act."

The Harlem bridge was declared by statute to be a public highway, the care and custody of which devolved by the act of 1857, *c.* 774, upon the counties of New York and Westchester. By the laws of 1871, *c.* 574, the custody and control of the bridge passed to the department of parks, one of the departments of the respondents; and when, in 1873, the south-east portion of Westchester county, including the territory about the bridge, was annexed to the city of New York, the exclusive control of the bridge passed to the department of parks, in precisely the same manner as that department had the care and control of the streets in the upper parts of the city, and in the annexed territory. In the recent case of *Ehrgott* v. *Mayor, etc.*, 96 N. Y. 264, the corporation was held answerable for an injury to the plaintiff through negligence in the care of the streets in the annexed district in charge of the department of parks. The court say, (page 272:)

"It is the duty of the city to keep its streets in repair, and that duty as to all the streets in the annexed territory is devolved upon the park commissioners. It is a duty which they discharge, not for themselves, not for the public generally, but for the city. The duty is not taken away from the city. It is still bound to discharge the duty, and the park commissioners are the agency through which it discharges it."

There can be no distinction in the obligations of the city as respects their care of the streets, and their care of the bridges that are declared by statute a public highway. The court of appeals, moreover, in the case last cited, cite with approval the case of *Richards* v. *The Mayor*, 16 Jones & S. 315, where the city was held answerable for an injury happening through a defect in a bridge which, like the present, was under the control of the department of parks. These cases seem to me to be equivalent to an express adjudication by the state courts that the corporation is liable for any negligence in the management of streets or bridges under the department of parks; and as an adjudication upon the relation of that department to the corporation under the state laws, it must be adopted and followed by this court.

The duty to take proper care of a bridge includes the duty to make proper provision for the passage of vessels through the draw. The waters of the Harlem river are public navigable waters of the United States. In constructing the bridge with a draw, and in undertaking to open and manage the draw so as to allow vessels to pass, the state and the city have recognized the right of vessels to pass through without any appeal to the national authority to protect that right. *People* v. *Saratoga, etc., R. Co.*, 15 Wend. 113, 134, 136; *Escanaba Co.* v. *Chicago*, 107 U. S. 678, 683; S. C. 2 Sup. Ct. Rep. 185; *Miller* v. *Mayor, etc.*, 109 U. S. 385, 393; S. C. 3 Sup. Ct. Rep. 228. Having thus recognized the rights of commerce, and undertaken to provide accommodations for the passage of vessels, the corporation is bound that the custodians of the bridge shall use ordinary diligence

tò avoid accidents to vessels going through the draw at customary hours, and in the customary manner, as one of the incidents of the care, management, and control of the bridge itself. It is responsible, therefore, for the want of ordinary care and diligence in its servants, and for the consequent damage.

Both parties being found in fault, the libelant is entitled to one-half his damages and costs, and an order of reference may be taken to compute the amount, if not agreed upon.