,SOUTHERN TRANSP. CO. v. PHILADELPHIA, B. & W. R. CO.

(District Court, D. Maryland.   May 20, 1912.)

1. NAVIGABLE WATERS (§ 20*)—BRIDGES—CARE IN CONSTRUCTION.·
   The owner of a bridge over a navigable stream, although licensed by
   Congress to maintain it, has no right unnecessarily to make it or its ap-
   proaches dangerous to vessels passing through the draw.
   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–
   99; Dec. Dig. § 20.*]

2. NAVIGABLE WATERS (§ 20*)—BRIDGES—INJURIES FROM COLLISION WITH
   BRIDGE.
   The owner of a bridge across the Potomac river *held* liable for an in-
   jury to a barge passing through the draw as part of a tow by striking
   an iron-shod timber 6 feet under water, which projected 12 inches be-
   yond any other part of the pier, there being no evidence to show that it
   was necessary or served any useful purpose. The·barge *held* not in fault
   because of alleged negligent steering.
   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–
   99; Dec. Dig. § 20.*]

3. NAVIGABLE WATERS (§ 20*)—BRIDGES—DANGER TO NAVIGATION.
   The owner of a bridge over navigable water must adequately guard
   vessels navigating in its vicinity from any concealed danger to which
   the bridge exposes navigation.
   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–
   99; Dec. Dig. § 20.*]

In Admiralty.   Suit by the Southern Transportation Company, as
owner of the barge Brandywine, against the Philadelphia, Baltimore
& Washington Railroad Company.   Decree for libelant.

Arthur D. Foster, of Baltimore, Md., for·libelant.
Shirley Carter, of Baltimore, Md., for respondent.

ROSE, District Judge.   The libelant owns the barge Brandywine;
the respondent a drawbridge over the Potomac river.   On Decem-
ber 30, 1910, the barge, while attempting to pass through the draw,
was badly injured.   The libelant seeks compensation therefor.   The·
barge with six others was in tow of the tugs Southern and Bohemia.
Neither of such tugs belong to the libelant.   The barges were laden
with coal.   At Alexandria, as preparatory to going through the draw,
the hawsers had been shortened and the tow rearranged.   The tugs
were lashed side by side.   The Southern·was on the starboard or
northern side; the Bohemia on the port or southern.   The barges
followed in pairs.   The first pair was 15 to 20 fathoms behind the
tugs.   There was an interval of from 10 to 12 fathoms between
the first pair and the second; from 7 to 10 between the second and
the third, while the seventh barge was about as far astern of the third
pair.   The Brandywine was the starboard or northernmost barge of
the second pair.   It followed the Mattaponi, which was the starboard
barge of the first.   Behind the Brandywine was the Wissahickon.   The
Patuxent was to the stern of the last named.   The wind was north
northwest. . It was ebb tide.   The aggregate width of the two tugs
when lashed together and of each pair of barges was apparently

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

slightly less than 50 feet.   The width of the channel through the draw between the piers was 104 feet 5 inches.   While passing through the draw, the tugs themselves appear to have kept very nearly in the center of the channel.   Only one witness speaks directly to this point. Capt. Freeburger of the tug Bohemia says his vessel came within 12 or 15 feet of the southernmost pier.   If he is right, there must have been 35 feet between the southern, the starboard tug, and the northernmost pier.   The distance between the southern pier and the port tug was probably greater than the witness supposes.   If it was not, it is hard to understand how, the hawsers in use being as short as they were, the Mattaponi came as close as it did to the northern pier and the Brandywine collided with that pier.   However this may be, the failure of any other witness to refer to the position of the tugs in the channel is sufficient proof that they were not close enough to either pier to attract attention thereby.   The flotilla was moving very slowly.   It was making not more than from $1\frac{1}{2}$ to 2 miles an hour.

All the testimony agrees that until the barges were very close to the pier, say within 60 feet of it, they kept accurately in the wake of the tugs.   As the Mattaponi was about to pass through the draw, some force sent her stern to starboard; that is, towards the northernmost pier.   She came within 18 inches of it.   The bow of the Brandywine sheered still farther in the same direction.   Its captain was at the helm.   A deck hand, the only other person aboard, was at the bow with the fender.   When the sheer manifested itself the helm was put hard to starboard.   The swing could not be controlled.   The bluff of its bow struck the fender piling designed to prevent collisions between vessels and the northernmost pier, or to break the force of such collisions as might take place.   In spite of the piling, the Brandywine came into contact with the pier.   The pier itself was of concrete. A portion of it, extending 12 feet from a point 4 or 5 feet below the water line to a point 7 or 8 feet above it, was surrounded by crushed stone held in place by a strongly timbered wooden casing.   The corner of this casing was protected by angle irons.   The bluff of the bow of the Brandywine struck these angle irons and bent or forced them noticeably to the northward.   This blow was so distributed as to do the Brandywine no harm.   None of its timbers were broken; none of its seams were opened.   Much more serious was the consequence of the Brandywine striking the corner of an iron-shod timber which, at a point 6 feet or thereabouts below the water line, projected out from the easternmost face of the pier for a distance of 12 inches or more.   At the southernmost corner of the pier, that is to say, the corner of the pier with which a vessel ascending the river would be most likely to come into contact, there was this timber projecting 12 inches farther into the stream than any other part of the pier. The Brandywine struck against the end or corner of this timber and stove a hole in her planking.   The hawser connecting the Brandywine with the Mattaponi parted.   The Wissahickon, continuing its forward course, crashed into the stern of the Brandywine and did some damage.   The Patuxent came into collision with the stern of the

Wissahickon. Both were injured. The Brandywine at once began to fill. By the time one of the tugs had gotten it over on the flats, it sank. It was subsequently raised and repaired.

There is little or no conflict as to the matters above stated. Indeed, there is only one material fact in controversy. That relates to the fender piling with which the Brandywine first came into collision. This piling was constructed and maintained by the respondent.

The libelant says, in the first place, that this piling, even as originally constructed, did not give to vessels using the draw the protection to which they were entitled; and, in the second, that it had before the collision been allowed to get so much out of repair as to be altogether useless to them.

The piling in question consisted of a clump or bunch of 13 piles; each of them having a butt of from 12 to 14 inches in diameter. They were bound together by wire ropes. The witnesses for the libelant say that, had these piles been arranged in a line curving out from the pier as ferry slips usually are constructed, they would have been far more serviceable in preventing vessels from coming into dangerous collisions with the pier. According to these witnesses, the fender piling of the public bridge which crosses the river a little to the west of the railroad bridge is so arranged. It is unnecessary to pass upon this question, nor will it serve any good purpose in this case to inquire how far the respondent was bound to go in protecting vessels from the harm which might result to them from coming into contact with the pier. In the arguments at bar the learned advocate for the respondent contended that it owed no duty of that kind. It had the permission of Congress to erect the bridge. It was the business of the shipping to keep away from the piers and abutments of the bridge. If any vessel failed to do so, it must bear its own loss. It must make good any damage it did the bridge. In support of this contention, he cited West v. Martin, as reported in 47 Wash. 417, 92 Pac. 334; 51 Wash. 85, 97 Pac. 1102, 21 L. R. A. (N. S.) 324; and 222 U. S. 195, 32 Sup. Ct. 42, 56 L. Ed. ——. That case holds, as many which preceded it had previously held, that a vessel which as a result of its own careless navigation damages a bridge must pay for it. The question of what duty, if any, the owner of such a bridge owes to ships navigating the stream crossed by it was not there presented.

Upon the waterways of the country a great commerce is carried on far more cheaply than is otherwise possible. Bridges across navigable streams usually make navigation thereon more difficult and more dangerous. Rough and simple craft like scows and barges well serve many commercial purposes. They are more or less unwieldy. They cannot always be depended on to move with absolute precision. Collisions between them and the piers and abutments of the bridges crossing the waters over which they are towed will be not altogether infrequent.

[1] The respondent's witnesses say that had it not been for the fender piling collisions with this particular pier would have been not uncommon. Properly placed and maintained piling will usually keep

vessels from coming into contact with the piers and abutments of drawbridges, and will greatly reduce the destructive effects of many of the collisions which cannot be altogether prevented. Ordinarily such protection can easily be given and at comparatively small cost. Whether under such circumstances there is not a duty to give it has been asked. Edgerton v. The Mayor (D. C.) 27 Fed. 230. It does not appear to have been as yet judicially answered. It need not be here decided. The owner of such a bridge has no right unnecessarily to make it or its approaches dangerous. Texas & Pacific Ry. Co. v. Interstate Transportation Co. (C. C.) 42 Fed. 261.

[2] The projecting timber did the damage. It made the bridge more perilous to shipping. The libel expressly said that this timber was the cause of the accident. Respondent examined a number of witnesses more or less familiar with the bridge. It did not attempt to show why the timber was where it was, or that its being where it was served any purpose. Had it been a necessary feature of the bridge construction, it was still a peril not obvious to those rightfully using the river. Whatever its purpose, it was the duty of the respondent to protect vessels from the danger of coming into contact with it. Vessel Owners' Towing Ass'n v. Wilson, 63 Fed. 626.

[3] The nature of the injury suffered by the barge shows that, had it not been for this hidden peril, no serious harm would have been done. The contact with the pier and its casing did no damage to the barge and none of any moment to the pier. The former was sunk because the projecting iron-shod timber pierced its planking six feet below the water line. Under such circumstances, it makes no real difference whether the timber was an essential part of the bridge construction or not. In either event it was concealed. Respondent was required to take reasonable precautions to keep vessels from coming into contact with it. If unnecessary, it would have been harmless if properly protected. Was it so protected? It may be assumed without deciding that, as originally placed and planned, the fender piling was adequate for the purpose. Was it at the time of the accident? Witnesses for the respondent say that the piling was at the moment preceding the collision in as good order as it was when first constructed. According to them, the bunch of piling was then about four to six feet east of the pier. It extended about two feet six inches farther south than the northernmost pier. If they are right, its southernmost side was then about two feet six inches south of the southernmost side of the northernmost pier. If that was so, any vessel bound through the draw and which passed the piling without touching it would clear the pier by at least two feet six inches. The only way in which any upbound craft could come into contact with the northern abutment of the bridge was by first breaking down the piling or by first pushing such piling out of place. Respondent says that the barge did break off these 13 piles and drove them seven or eight feet to the north and six feet to the west, so that after the accident they were leaning up against the pier. It does not seem probable that this can have happened. If it had been, it is hard to understand why more damage was not done to the barge. A blow hard enough to have brought

about such a result would almost certainly have opened its seams. No such opening took place. A number of the witnesses for the libelant say that the piling had been out of position for some time before the accident and had been leaning so far to the north that it no longer protected the southeasternmost corner of the pier. They may have exaggerated the extent to which before the accident this leaning was perceptible. After seeing and hearing the witnesses, however, I am persuaded that at the time of the accident the fender piling was not in good condition. Had it been, I do not think that what happened could have taken place. It follows that the respondent was in fault.

Whether the tugs or either of them are also to blame is not before the court in this case. It is, perhaps, to be regretted that it is not. It is usually best to decide all the questions growing out of a collision in what is substantially a single proceeding. For some reason, however, in this case the respondent did not see fit to bring the tugs in by petition under the fifty-ninth rule. It still may, if so advised, seek to hold them liable in a subsequent proceeding. The Ira M. Hedges, 218 U. S. 264, 31 Sup. Ct. 17, 54 L. Ed. 1039, 20 Ann. Cas. 1235.

Was the barge to blame? It is not responsible for faulty navigation of the tugs. Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591; The Eugene F. Moran, 212 U. S. 473, 29 Sup. Ct. 339, 53 L. Ed. 600. Whether such navigation was as careful as it should have been is one of the matters upon which the testimony is conflicting. It is unnecessary, and therefore under the circumstances inexpedient, to intimate any opinion upon this question except to say that the fault, if any, was not of a character for which the barge also would be liable.

Respondent says that the barge itself was in fault. According to this contention, the accident happened because of negligent or improper steering of the barge. The only evidence that there was improper steering was the fact that the sheer took place. What caused it is not shown. Such sheers are often caused by other things than the mistakes of the helmsman. As in this case, it not infrequently happens that their real cause is a mystery. The barge was proceeding very slowly. It seems unlikely, under such conditions, that any probable negligence on the part of the man at the helm could have caused so rank a sheer. At the time of the accident the captain of the barge was himself steering. He testified. He impressed me as a truthful witness. He said that he was steering carefully and that until the sheer took place his barge had followed accurately in the wake of the starboard tug and of the Mattaponi. There is no reason, therefore, to hold the barge in fault.

The libelant is entitled to a decree against the respondent for the full amount of the damage to the Brandywine and the other barges owned by it and injured by the collision, without prejudice to any rights which the respondent may have to seek in another proceeding contribution against the tugs, or either of them. If the parties cannot agree as to the amount of damage suffered by the Brandywine, the Wissahickon, and the Patuxent, they may have the usual decree for a reference.