### THOMPSON-LOCKHART CO. v. CITY OF PHILADELPHIA.

(District Court, E. D. Pennsylvania.   March 5, 1914.)

No. 56.

NAVIGABLE WATERS (§ 20*)—BRIDGES MAINTAINED BY CITY—LIABILITY FOR OBSTRUCTIONS TO NAVIGATION.

A city having general authority to build and maintain bridges over navigable streams is liable in a court of admiralty for an injury to a vessel while being properly navigated under such a bridge, caused by a timber used in the construction of an abutment and left projecting under water, where it cannot be seen, without being protected or marked, and where it constituted a dangerous obstruction to navigation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. § 20.*

Obstruction of navigable waters, jurisdiction of federal courts, see note to Bailey v. Mosher, 11 C. C. A. 318.]

In Admiralty.   Suit by the Thompson-Lockhart Company against the City of Philadelphia.   Decree for libelant.

J. Frank Staley and Lewis, Adler & Laws, all of Philadelphia, Pa., for libelant.

Edgar W. Lank, Asst. City Sol., and Michael J. Ryan, City Sol., both of Philadelphia, for City of Philadelphia.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

J. B. McPHERSON, Circuit Judge. The witnesses in this case were heard in open court; I find the facts to be as follows:

The libelant is a Pennsylvania corporation, and on January 17, 1913, was the owner of Lighter No. 4, a deck barge 104 feet long and 24 feet 6 inches beam, with sides running straight up and down. She was then employed in carrying ashes and rubbish between points upon the Schuylkill river within the port of Philadelphia. The city owns and maintains a drawbridge crossing the river at South street, and on the date mentioned was charged with the duty of maintaining and safeguarding the abutments, or piers, of the bridge; so that vessels navigating the river and using the narrow channels under the bridge with proper care might proceed in safety. Between half past 3 and 4 o'clock in the afternoon of January 17—the weather being clear and calm, and the tide at low water—the lighter loaded with ashes and rubbish, and the scow Reliance loaded with garbage, were taken in tow by the tug Helen, to be moved south from Fairmount wharf to Penrose Ferry Bridge. The lighter was made fast to the starboard side of the tug, and the scow, to the port side. The Reliance was also a large vessel of 18 or 20 foot beam, and as the tug was 14-foot beam, the whole tow was about 60 feet in width. The channel through which the tug and tow were about to pass was the first on the western side of the draw, and was 70 or 71 feet wide on the surface of the water, not much margin being left on either side of the tow. The lighter was drawing from 6 to 7 feet. The tow was properly made up in the usual manner, and at the time of the collision the lighter and the tug were seaworthy and properly manned and equipped, and were proceeding carefully and slowly down the river. The tug was in charge of a licensed master, who had seen more than 30 years of service, was well acquainted with the river, and had often conducted similar tows under this and other bridges. While the tow was passing through the narrow channel under one bell, the starboard side of the lighter being a short distance from the visible and flat stone face of the pier, this side of the lighter collided with a projecting timber that had been part of a temporary structure, or caisson, erected either when the pier was built or when it was repaired about 15 years ago. The caisson had not been wholly removed, and the part that remained was hidden below the surface of the water. None of it was visible at any stage of the tide, and as it was also unmarked and unprotected, it was dangerous to vessels passing through this channel even with due care. The presence of the obstruction was unknown to the master of the tug and to the man in charge of the lighter.

It may be desirable to describe the situation a little more in detail: Two stone or concrete ledges make part of the construction of this western pier. Both are always under water, and at half ebb—the stage when a diver of many years' experience made an examination on January 31, 1913—the upper ledge, projecting 12 inches, was found to be about 5 feet below the surface, and the lower ledge, 4 feet further down and projecting 18 inches, was found to be about 9 feet below the surface. Outside of both ledges was part of the caisson referred to, built of heavy timbers, 12 by 12, and from the upper part of this caisson one timber had been partly detached, and was extending up-

ward about 2 feet above the lower ledge. At low tide—the stage when the injury was done—the timber would be from 2 to 3 feet nearer the surface, and would be near enough to account for the injury complained of. I have no doubt, and I so find, that the timber delivered the blow in question. No spring piling or other device then protected vessels from the hidden danger, and no notice or warning of any kind had been given to call attention to the situation.

The damage received by the lighter is shown by the photographs that were taken while she was being repaired. She was struck amidships, and not far from her bottom, and the blow was evidently. severe. There is no appearance of injury above the broken planks, and none above the water line. The collision was not due to any fault in navigation or otherwise on the part of the lighter or of the tug, but was wholly due to the fault of the city in so maintaining the pier or abutment as to be an obstruction to careful and proper navigation. The precise fault now involved is permitting the projecting timber to remain without proper protection by piling or other means, and without any warning of its presence, either by marking or otherwise. It is of some weight that in other narrow channels in and near Philadelphia similar piers or abutments are usually protected.

Situations resembling this have been considered frequently by other courts, and the decisions seem to make discussion superfluous. Railroad Company v. Towboat Co., 64 U. S. (23 How.) 209, 16 L. Ed. 433; Towing Co. v. Wilson, 63 Fed. 626, 11 C. C. A. 366; Southern, etc., Co. v. Railroad Company (D. C.) 196 Fed. 550, affirmed 205 Fed. 732, 124 C. C. A. 26; Milwaukee v. Kensington, etc., Co., 199 Fed. 109, 120 C. C. A. 228; The Nonpareil (D. C.) 149 Fed. 521, and cases cited in these decisions.

The Pennsylvania cases cited by the city (Clarke v. Bridge Co., 41 Pa. 147, and Childs v. Crawford Co., 176 Pa. 139, 34 Atl. 1020) do not apply. No evidence was offered concerning the extent of the city's authority in reference to the construction and maintenance of this bridge; but, if its general authority to build and maintain be assumed, the question is still presented, whether the city is liable for maintaining an obstruction to navigation within the jurisdiction of a court of admiralty. And this question, in my opinion, should be answered in the affirmative.

As a result of the collision the side of the lighter was broken in, about 18 inches or 2 feet above the bottom, causing her to fill, and requiring her to be put aground. It was necessary, also, to remove her cargo before she could be raised and repaired. No objection is made to any item of the claim, and a decree may therefore be entered in favor of the libelant for $1,415.67, with interest and costs.