## BERNARD & SAMSEL v. CITY OF PHILADELPHIA.

(District Court, E. D. Pennsylvania. March 5, 1914.)

No. 42.

NAVIGABLE WATERS (§ 20*)—BRIDGES MAINTAINED BY CITY—LIABILITY FOR OBSTRUCTIONS TO NAVIGATION.

    A city having general authority to build and maintain bridges over navigable streams is under the duty of making the channels under such bridges safe for navigation, and is liable for an injury to a vessel being properly navigated, caused by a projection of a stone abutment under water, which cannot be seen, and is unguarded and unmarked.

    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. § 20.*]

In Admiralty. Suit by Bernard & Samsel, managing owners of the tug Augusta, as bailees, etc., against the City of Philadelphia. Decree for libelants.

J. Frank Staley and Lewis, Adler & Laws, all of Philadelphia, Pa., for libelants.

Edgar W. Lank, Asst. City Sol., and Michael J. Ryan, City Sol., both of Philadelphia, Pa., for city of Philadelphia.

J. B. McPHERSON, Circuit Judge. The witnesses in this case were heard in open court; I find the facts to be as follows:

On May 28, 1911, the libelants were the managing owners of the tug Augusta, and were also bailees of the hinged barge, or canal boat, No. 124, and four other boats with their cargoes of coal. All the boats and their cargoes belonged to the Lehigh Coal & Navigation Company, and the tug had been engaged to tow them from a point on the Delaware river to points on the Schuylkill river within the port of Philadelphia.

The city of Philadelphia owns and maintains a drawbridge crossing the Schuylkill river at South street, and on the date mentioned was charged with the duty of maintaining, and safeguarding the abutments and piers of the bridge so that vessels navigating the river and using the narrow channels under the bridge with proper care might proceed in safety. About half past 9 o'clock on the morning of May 28th the tug was in charge of a competent and duly licensed master, who had had several years' experience in similar work and was well acquainted with the river. She had the five loaded canal boats in tow, and was proceeding north up the Schuylkill river. The boats were in two tiers, the first tier comprising three boats abreast, and the second tier comprising two boats abreast, made fast to the preceding tier. The boats were made fast to the eastern, or starboard, side of the tug, No. 124 being the starboard boat in the second tier. Each boat was 10 feet 6 inches beam, and the tug was 14 feet beam. No. 124 was 88 feet long, the boxes being about equal in length. The channel through which the tug and tow were about to pass was the first on the eastern side of the draw, and was 70 or 71 feet wide on the surface

of the water, leaving a margin of about 25 feet. The boats were drawing about 5 feet 3 inches. While the tug and tow were in the act of passing through the channel referred to, No. 124 collided with a submerged obstruction, or stone ledge forming part of the eastern abutment of the draw, the blow doing such damage to her planking that she sprung a leak and afterwards sank. At the time of the collision the tide was the young flood, a few minutes after low water, and the weather was clear and calm. The tow was properly made up in the usual manner, and the tug and boats, including No. 124, were seaworthy and fully manned and equipped. The tug and tow were proceeding carefully through the channel in the usual manner; but the ledge or obstruction referred to, which was part of the construction of the abutment, was submerged and hidden below the surface of the water at any stage of the tide, and was unmarked and unprotected. It was therefore dangerous to vessels using the channel even with proper care. The existence of the obstruction was unknown to those in charge of the tug and tow.

The damage received by No. 124 and her cargo was not due to any fault of navigation or otherwise on the part of the tug or of the boats, but was due solely to the fault of the city, especially in maintaining the abutment, or pier, referred to in an improper manner, unsafe to navigation, without marking or giving notice of the submerged ledge, or protecting it by piling or any other device. As a result of the collision the side of No. 124 was broken in so that she filled and sank soon afterwards. The cargo of the boat was pumped out and the boat was raised and repaired, the claim for salvage of cargo and boat and for making repairs amounting to $341.66. In addition thereto a claim is made for losing the use of the boat for 33 days, at the rate of $5 per day, or $165, making the total damages claimed by the libelants as bailees the sum of $506.66.

When the bridge was originally constructed, the western face of the eastern pier of the channel referred to had a flat stone surface above the surface of the water, but below the surface there were two stone ledges, one about a foot below the surface of the water at low tide, projecting into the channel about 12 inches, and the other, about 4 feet, 6 inches below the surface, projecting into the channel from 18 inches to 2 feet. The existence of these ledges was discovered by sounding with a pole at low water several months ago; the conditions being unchanged. The ledges were not visible at any stage of the water, and had never been protected. No. 124 did not strike the face of the pier above the surface, clearing it by a short distance, but struck one of the submerged ledges, probably the second. The blow was delivered nearly amidships, about the junction of the two boxes, battering and splitting the planks and letting in the water rapidly. It is of some weight that in other narrow channels in or near Philadelphia similar piers or abutments are usually protected.

It is not necessary to discuss the city's liability. In my opinion this is established by the cases cited in the opinion (filed herewith) in Thompson-Lockhart Co. v. City of Philadelphia, 212 Fed. 965, to which reference is hereby made. The city is at fault in failing to protect these dangerous ledges by piling or some equivalent device.

No objection is made to any item of the claim, and a decree may therefore be entered in favor of the libelants for $506.66, with interest from July 1, 1911, and costs.