**BEAUFORT & MOREHEAD R. CO. et al.**

**v.**

**The DAMYANK et al.**

**The CITY OF FAYETTEVILLE.**

**No. 218.**

United States District Court
E. D. North Carolina,
New Bern Division.

May 4, 1954.

J. F. Duncan and C. R. Wheatly, Jr., Beaufort, N. C., for libelants.

Hughes, Little & Seawell, Norfolk, Va., R. E. Whitehurst, New Bern, N. C., for intervening libelant.

John W. Oast, Jr., Norfolk, Va., for respondents.

---

GILLIAM, District Judge.

These are the facts found by the Court:

Libellants are, respectively, owner and operator of a railway bridge over the Newport River between Morehead City and Beaufort, North Carolina. Respondent, Lynch Brothers, is the owner and operator of the tug and barge involved.

The railway bridge runs in a generally east and west direction parallel to and twelve feet north of a State Highway bridge. The channel runs generally north and south, and there is an opening of eighty feet in the draws of both bridges. To the north of the railway bridge draw and to the south of the highway bridge draw, fenders of the usual bell type were originally constructed in accord with the regulations of the corps of Army Engineers. In September, 1952, a tug and barge damaged the southeast fender of the highway bridge and the northwest fender of the railway bridge. The highway fender to the south was restored, but the railway bridge fender was not, and a gap of about thirty-five feet in this fender was left and existed at the time of the collision, which is the basis of this proceeding.

This gap of thirty-five feet is referred to in the evidence as the A–B section; the remaining piling at the northwest of this fender is referred to as the A–C section, and it is this section which was destroyed by the instant collision. The A–C section was not damaged or impaired in effectiveness by the 1952 collision and prior to and at the time of the instant collision was serving as a normal guide and protection for vessels approaching the draw from the north. The appearance of the fender was, of course, marred by the first collision and the overall value diminished, but so far as the second collision is concerned, the gap in the piling played no important part, since the vessels were approaching the bridges from the south. The presence of this section of the draw would not have prevented the damage to the remaining section and its absence did not enter into the cause of such destruction; had it been present, it, too, would have been destroyed.

Libel was filed on account of damage to section A–B sustained in the first collision, and the claim was settled for $15,500.

At about 4:00 a. m. September 5, 1953, Captain Peters, employed by respondent, proceeded to get underway at the Morehead City Port Terminal, which lies south of the bridges involved. The barge "City of Fayetteville" was loaded with 9,000 barrels of fuel, and was made up at the bow of the tug "Damyank". The loaded draft of the barge was about 8½ feet. The tug is a turn screw, diesel propelled, with pilot house engine control, fitted with "knees" for pushing. The tow was securely lashed and the unit was rigid with a total length of 260 feet and a beam of 35 feet. After backing into the channel the unit was approximately 600 yards from the entrance to the highway draw. It was clear and dark and visibility was good. There was a moderate wind from the southwest, and a flood tide running northerly with a current running at from 4 to 6 knots. The tow gradually increased its speed to gain steerage way and at the time of the collision was proceeding at a speed between 10 and 15 miles per hour. The tide swung the tow off its course, so that the starboard quarter of the barge struck and slid along the east wing of the highway bridge fender and thereupon, with no slackening of speed, the tow struck and completely destroyed the extreme northwest cluster of piles, section A–C of the railway bridge west fender. No other vessel was involved. Captain Peters had passed through the draws before approximately one hundred times, eighteen to twenty times within the three months preceding this accident.

The cost of restoring the complete fender, as of the date of the damage done to it by the second collision, is fixed at $26,120. No effort is made to determine the replacement cost of what remained after

the first collision, as I am of the opinion that under the evidence a more equitable result will be obtained by using the replacement cost of the entire structure as a basis of calculation. Besides, the estimates as to replacement cost of the A–C section are not satisfactory.

 Upon these facts, I conclude that the tow was negligently navigated and that the damage to libellants' property resulted proximately from such negligence. Where a moving vessel strikes a fixed structure, the presumption normally follows that the moving vessel was at fault. The Cromwell, 4 Cir., 259 F. 166; United States v. Norfolk-Berkley Bridge Corp., D.C., 29 F.2d 115.

Captain Peters was fully aware of the condition of the fender and had full knowledge of the waters, and it was incumbent upon him to so navigate the tow as to avoid contact first with the highway bridge fender and thereafter to the fender belonging to libellants. The Golden Age, 2 Cir., 6 F.2d 877, 878: "With full knowledge of these waters, it was incumbent upon the tug to so navigate as to avoid contact with this abutment, or its extension below the water line. Whatever part of the abutment was struck, it was negligent for the Golden Age to allow the barge to come in contact with it. There is no room for conjecture. * * * It was a clear day and good water conditions, and to allow the barge to strike in the manner described, * * * was such a breach of the engagement * * * as to constitute negligence, and we have no difficulty in placing the blame upon the tug."

 Actually, the respondents do not seriously oppose a finding of their liability, unless it is found that the libellants were maintaining an illegal structure and have failed to carry the burden of proving that such illegality was not one of the factors or causes which contributed to the damages. The principle upon which this defense is based is set out in the Norfolk-Berkley Bridge Corp. case, above cited, and other cases. However, in these cases it appeared that the structures were illegal because they constituted an obstruction to navigation, such as the bridge gear which projected over the draw in the Norfolk-Berkley Bridge case, and the iron shod timber, which projected out from the face of the pier for a distance of more than twelve inches in Southern Transp. Co. v. Philadelphia, B. & W. R. Co., D.C., 196 F. 548. In those cases free navigation was affected, but not so here. I find nothing illegal in the structure with which we are dealing and I find also that, even if true, such illegality had nothing whatever to do with the infliction of the damages. The chain of circumstances resulting in damages began when the tow struck the highway bridge fender on the east, after which it approached the opening at an angle instead of in a straight course. Certainly the missing part of libellants' fender north of the railway bridge did not enter into this occurrence, and if the tow had then been carefully navigated there would have been no damage, but there was no slackening of speed, no precaution taken to avoid contact with the railway bridge fender; rather navigation proceeded as if no danger existed. As found above, in view of the manner in which the tow was navigated, the missing part of the piling would have gone down too had it been there. So I find that the bridge and fender were not negligent.

 The troublesome question in the case, so far as I am concerned, is that of assessing the damages. Ordinarily, the measure of damages in cases of property destruction is the market value of property destroyed and, in cases of damages, the cost of repairs. Here we have a case of destruction, but certainly it is not possible to fix a market value, as the property had no market value, so that we must resort to the cost of repairs or replacement rule. We are dealing with a structure which had been substantially damaged before, and thereafter, before any repairs were made, was completely destroyed.

It is my conclusion that, in the situation presented, the fairest and most equitable measure of damages is the replacement cost of the original fender less the cost of repairing the original damage. Petition of Socony Transp. Co. (The Voco; The Choapa), D.C., 93 F.Supp. 718. There is some evidence of what it would have cost to repair the original damage, but, as observed before, this evidence seems unsatisfactory. However, it is in evidence that the parties at the time reached an agreement in regard to the amount of damages and these libellants received this amount, $15,500, in settlement. The end in view in assessing damages in a case like this is to restore the damaged party to the position which he held before the damage. Libellants now will be restored to their position before the first collision by replacement of the fender in its original condition which, as found, can be done at a cost of $26,120, but they heretofore have received $15,500 which may be utilized for the purpose, so that to restore them to the status quo as of the date of the first collision their out-of-pocket cost will be the difference, or $10,620.

A decree accordingly will be entered.