VESSEL OWNERS' TOWING CO. et al. v. WILSON et al.

(Circuit Court of Appeals, Seventh Circuit. May 31, 1894.)

No. 151.

1. NEGLIGENCE—OBSTRUCTION IN NAVIGABLE STREAM.
The faces of the piers of a drawbridge were not perpendicular, but were built out under the surface of the water, in irregular projections of steps to the bottom of the river. Contractors, in repairing the bridge, took up piles which had been driven around the piers to ward off vessels. *Held*, that they were liable for injuries sustained by a vessel striking against the under-water projections of a pier.

2. TOWAGE—NEGLIGENCE.
A loaded vessel, while being towed down the Chicago river in broad day, struck against the abutments of a bridge pier extending below the

surface of the water. These abutments had existed for 25 years, but had been guarded by piles which had been lately removed. *Held*, that the tug was guilty of negligence.

On Appeal from the District Court of the United States for the Northern District of Illinois.

Libel by Thomas Wilson, R. McLaughlin, Mary P. Wilson, D. Morris, Wilson D. Morris, Thomas E. Quayle, William H. Quayle, George L. Quayle, Alvira Scott, Luther T. Lyman, William Wilson, the Maritime Insurance Company, and the Insurance Company of Philadelphia against the city of Chicago, the North Chicago Street-Railroad Company, the Vessel Owners' Towing Company, and the Fitz Simons & Connell Company. Libelants obtained a decree against the Vessel Owners' Towing Company and the Fitz Simons & Connell Company, and the latter appeal.

This was a libel by the owners of the steamship Wallula and by the owners and insurers of her cargo for injuries sustained by the vessel and cargo in collision with the south abutment of the Wells street bridge over the Chicago river in the city of Chicago during an attempt to pass down the river and through the south draw of the bridge, under the following circumstances: The piers of the Wells street bridge were constructed some 25 years ago. Above the surface of the water they presented a smooth face of masonry; below the surface they were built in footing courses extending from a point five feet below the surface some six feet into the river, in irregular projections of steps, to the bottom of the river. A row of spiles was maintained by the city of Chicago in the river along the face of the abutment, driven close to the abutment at its base, and standing some six feet from its face above the water, serving to ward off vessels from contact with the abutment. The other and more modern abutments of other bridges over the river were not so constructed, but present a smooth batter face to the bottom of the river, and, while not perpendicular, were constructed at a very slight incline, the projecting spiles being only some two feet from the face of the abutment above the water. A street-railway company, under an arrangement with the city, undertook to construct new abutments and a new bridge at Wells street. The appellant Fitz Simons & Connell Company became the contractor for the erection of the substructure. The piers or abutments were to be taken out and removed some 10 feet nearer the shore, increasing the width of the draws of the bridge, then some 16 feet. By its contract it agreed to erect and maintain such guards, and during the nighttime such lights, as would prevent the happening of accidents or harm to life or property in consequence of the digging up, use, or occupancy of any highway, and covenanted for liability for all damages occasioned by the digging up or use or occupancy of any highway, or which might result therefrom, or from the carelessness of any servant of the company. Work was first begun in the north draw, and was completed early in the month of April, 1888, so that it was free for the passage of vessels before the commencement of work in the south draw, except that several schooners were lying at their winter berth, about 150 feet east of the draw, rendering it impassable for large vessels. The company thereupon, and a day or two prior to the collision in question, removed all the protecting piles in the south draw by means of block and fall purchase operated in a pile driver mounted on a scow. Just prior to the time of the accident its servants were engaged upon the scow in removing a group of spring piles at the northeast corner of the pier. At the time of the collision, opposite the south draw and from 150 to 300 feet west of the west end of the central projecting piling supporting the bridge, the Palmer, a large steam barge, lay aground, her bow pointing eastwardly to the lake, and had so been lying for 24 hours before the collision. About noon of the 9th of April, 1888, the steamship Wallula, laden with a cargo of 66,000 bushels of oats consigned to Buffalo, was proceeding down the river in tow of two tugs, owned and operated by the appellant the Vessel Owners' Towing Company.

the Carpenter ahead and the Van Schaick astern. The Wallula had no steam up, and had no control of her own movements, her tiller being lashed amidships by direction of the tugs. She passed to the north of the Palmer, stopping when opposite to that vessel,—in the opinion of some of the witnesses, because she grounded alongside of the Palmer. Whether that were so or not, the head tug started up suddenly and "wide open," giving the Wallula a headway of from two to three miles an hour, not in a direct line through the draw, but swinging to starboard towards the abutment. As the Wallula bore down upon the abutment, and when from 20 to 60 feet distant therefrom, the tug Carpenter swung off to port, working with full steam to check the steamer on her course, and endeavored to pull the stem of the Wallula around, to avoid collision with the abutment. The maneuver was too late, and the Wallula crashed into the abutment at an angle of about three points, coming in contact with the salient of one of the footing courses of the abutment, about five feet below the surface of the water. Under the guidance of the tugs she proceeded down the river to the Central elevator. Upon examination of her bow and side above the water no fractures were found, and it was supposed that no injury had been received. Upon sounding the next morning, four feet of water were found to be in her hold, and upon removing the hatches the water could be heard running in. Pumps were then applied, the uninjured grain removed, and the injured grain taken out and sold. The vessel was placed in dry dock, where it was discovered that an irregular hole had been made in the bluff of her bow below the water line on her starboard side from 10 to 15 feet from the stem. It was of the character of a heavy gouge, breaking and shredding a plank 5 inches thick. The district judge held that the injury was sustained by the joint negligence of the appellants, and decreed that each should pay one-half the damages sustained. The opinion of the court is reported under the title of Wilson v. City of Chicago, 42 Fed. 506.

C. E. Kremer, for the Vessel Owners' Towing Co.
Ball, Wood & Oakley, for the Fitz Simons-Connell Co.
Harvey D. Goulder and C. W. Greenfield, for appellees.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

JENKINS, Circuit Judge (after stating the facts as above). That portion of the abutment below the surface of the water was, by reason of its position and peculiar construction, a concealed and imminently dangerous obstruction to the navigation of the river. As it was placed there by the city of Chicago, so it became the duty of the city, so long as the obstruction was maintained, to so guard it that injury therefrom should not result to vessels navigating the river. Philadelphia R. Co. v. Philadelphia, etc., Towboat Co., 23 How. 209. That duty was sought to be discharged by maintaining spiles along the face of the obstruction, which were effectual to prevent vessels passing the draw of the bridge from coming in collision with the projecting footing courses of the abutment. The maintaining in place of these spiles, in the absence of other safeguards, was an imperative duty. Their removal was an act of negligence contributing to produce the injury here complained of. Acting under authority of the city, the contractor, as well by its contract as by the law, was liable for damages arising from the removal of the protection. The duty is the same whether an obstruction to navigation be created or a protected obstruction be uncovered. The contractor undertook to perform the work of removing the

stonework, and to "keep free and unobstructed the channel of the river, so as not to interfere with or obstruct the movement of vessels or other craft," and to "maintain suitable signals and lights to be approved by the commissioner of public works as a warning to vessel men." This, however, merely emphasized an imperative duty imposed by law. The contractor is not absolved by his ignorance of the character of the construction below the surface of the water. Undertaking the work, he is chargeable with knowledge of the character of the work he undertook to perform. Removing protection work, whose obvious function was to protect vessels from contact with the abutment, the contractor is chargeable with knowledge of the fact of the obstruction and of its nature. The law cannot permit one to uncover a concealed and dangerous obstruction to navigation, and to plead in excuse ignorance of the character of the obstruction. He must act at his peril. Acting under the authority of the city that created the obstruction, and bound by the contract to protect the city, and bound by law to keep free and unobstructed the channel of the river, if, in the prosecution of the work, it became necessary to remove protection works that had been maintained by the city, and that guarded the navigation of the river, the contractor could not shut his eyes to the character of the obstruction that had so been covered, or negligently remain ignorant of its character. The protection work itself was notification of a danger that it guarded. Removing the protection, the actor was bound to know the character of the danger that he uncovered. The contractor knew of the submerged abutment, knew that it was dangerous, because protection work had been maintained to guard against that danger. Removing the protection and exposing the obstruction, the contractor is chargeable with knowledge of its character, and with the result of his negligent act in failing to substitute other and effectual safeguards and warnings. Casement v. Brown, 148 U. S. 615, 623, 13 Sup. Ct. 672. As matter of fact, the contractor had sufficient notice of the character of the submerged obstruction to put one upon inquiry as to its character. In a narrow draw, only 16 feet wide, the protection spiles were placed 6 feet away from the face of the abutment above the water, whereas at the other bridges in the city the protecting spiles are placed but two feet distant. Naturally there was a motive for this, when it is matter of common knowledge that such protecting spiles are driven close to the base of the abutment. The fact was sufficient to put the contractor upon inquiry, and failure to inquire, when inquiry would have disclosed the fact, was negligence.

We do not conceive that the contractor is excused upon the plea that the work in the north draw of the bridge had been finished. While the work was there progressing, the draw had been closed to navigation, and certain vessels had anchored for winter quarters at the east entrance of the draw. We think it was the duty of the contractor, under such circumstances, before proceeding with the work in the south draw, and before uncover-

ing so dangerous an obstruction, to see to it that the north draw was free to navigation. The contractor commenced the work and uncovered the obstruction in the south draw while the north draw was as effectually closed to navigation as though it had been blocked with the derricks and pile-drivers of the contractor.

Nor do we think the contractor excused by reason of the alleged negligence of the tug. The injury resulted from the combined negligence of the contractor and the tug. Concurring negligence is not a defense, and does not relieve from responsibility, where a plain duty was owing, and there was neglect in its performance. In such case the admiralty apportions the damages between the tort feasors. It enforces contribution from both parties in fault to liquidate the injury done to a third party.

The Wallula cannot be charged with the negligence of the tug. The latter was not her agent, but an independent contractor, and wholly controlled her movements. The Doris Eckhoff, 1 U. S. App. 129, 1 C. C. A. 494, 50 Fed. 134; The Niagara, 1 U. S. App. 658, 663, 3 C. C. A. 342, 52 Fed. 890; The T. J. Schuyler, 41 Fed. 477.

By the decree complained of the contractor is charged with a moiety of the damages only, unless the appellees should be unable to collect from the owners of the tug the one-half part of their damages awarded against the tug company. This is in accord with the settled principle of the admiralty, and is not subject to criticism. The Alabama, 92 U. S. 697; The Atlas, 93 U. S. 302; The Juniata, Id. 340; The Sterling and The Equator, 106 U. S. 647, 1 Sup. Ct. 89; The Max Morris, 137 U. S. 1, 10, 11 Sup. Ct. 29.

With respect to the claim of the contractor the Fitz Simons & Connell Company, in which the towing company does not join, that the Wallula is chargeable with gross negligence on the part of its officers subsequent to the collision, whereby the damage to the cargo was aggravated, we need only say that we have carefully examined the testimony, and do not think that the evidence bears out the contention of counsel. A review of the evidence convinces us that all proper efforts were taken in ascertainment of the injury and in protection of the cargo.

We think it equally clear that the tug was at fault. The Wallula was wholly under the control of the tug, and unable to help herself. The tug was "the dominant mind or will of the adventure" (The Fannie Tuthill, 12 Fed. 446), and took the whole responsibility of her navigation (The Express, 3 Cliff. 462, Fed. Cas. No. 4,209). The collision occurred in broad daylight, and under such circumstances the fact of the collision creates a presumption of negligence on the part of the tug. The Delaware, 20 Fed. 797. Engaging in the service of towing up and down the Chicago river, the tug was bound to know the channel, and whether, under the circumstances, it was safe to make the venture of passing the draw. The Margaret, 94 U. S. 494. And that obligation imposes upon the master of the tug, before undertaking the towing, a knowledge of the condition of the bottom and of the depth of water in the river, and of the exist-

ence and location of any well-known obstruction. The Lady Pike, 21 Wall. 1; Pettie v. Towboat Co., 1 U. S. App. 57, 1 C. C. A. 314, 49 Fed. 464; The Robert H. Burnett, 30 Fed. 214. This is not a case coming within the principle of the cases cited by counsel. The Angelina Corning, 1 Ben. 109, Fed. Cas. No. 384; The Willie, 2 Fed. 95, 8 Fed. 768; The James A. Garfield, 21 Fed. 474; The Mary N. Hogan, 30 Fed. 927; The Pierrepont, 42 Fed. 687. In those cases the tugs were absolved of responsibility for collision of the tow with unknown obstructions. Here this sunken obstruction had existed for some 25 years, and had been guarded, to the knowledge of the master of the tug, by these protection spiles. Prior to undertaking this towage, he knew those spiles had been removed. He knew those spiles stood out six feet from, and indicated that it would be dangerous to go nearer, the face of the abutment. He had seen these abutments in process of construction. The master of the tug sought to excuse himself by asserting that he supposed everything had been torn out when the piling was taken down, and yet the abutment stood there facing him with the protection gone. He confesses that his idea in towing the Wallula through the draw was simply to "keep her away from the visible thing." He assumed that the abutment proceeded on the same angle to the bottom of the river, notwithstanding he knew that the spiles stood out six feet from the face of the abutment, while at other bridges they stood out but two feet. With this knowledge, and this imperfect comprehension of his duty, and in view of the fact that the Van Schaick could give but little assistance in steering the Wallula by reason of the position of the Palmer in the channel, it was the duty of the captain of the Carpenter to have had the Wallula under control, and he should not have permitted her to enter the draw at such a speed and upon such an angle that collision with the abutment was inevitable. The decree will be affirmed.