## THE E. T. WILLIAMS.

### (Circuit Court of Appeals, Second Circuit. June 23, 1905.)

#### No. 205.

TOWAGE—INSUFFICIENT POWER OF TUG—LIABILITY FOR LOSS OF TOW.

A tug which took two scows to the dumping ground off New York, but was unable, for want of sufficient power, to bring them back against adverse winds after they were dumped, whereby one was lost, and the owner put to expense in rescuing the other, *held* in fault, and liable for the resulting loss, on the ground that the master was imprudent in undertaking the service under the weather conditions existing when he started; being himself without experience in the work, and the tug not having been previously used in such towing.

[Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Towage, §§ 11–22.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon an appeal from a decree of District Court, Southern District of New York, holding the tug responsible for total loss of dumper No. 9, and for salvage on dumper No. 8, both lost by the tug through parting of towing hawser in heavy weather after dumping beyond the lightship. The opinion of the District Court will be found in 126 Fed. 871.

John F. Foley, for appellant.

La Roy S. Gove, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

PER CURIAM. The cause was tried in court before the district judge, and, although it is a close one as to conditions of wind and sea at the crucial periods, we do not feel that we can disturb his finding as to the main issue. In view of the circumstances that the captain of the tug had never followed the sea outside, but was experienced only in steamboating around the harbor, and that the tug herself, employed in this service on an emergency, was not shown to have been well fitted for such heavy weather, we concur in the conclusion that it was imprudent in him to take the dumpers out to the lightship on the calculation that he could bring them back against a 30-mile wind. The wind was undoubtedly much higher when the towing hawser parted, but during the four hours immediately after dumping it seems to have been lighter than it was when he went down, and within the limit which he calculated he could come back against with a flood tide. We have not overlooked the argument as to different conditions between the roof of the Equitable Building where the wind records are kept and the open ocean, 16 miles away, nor the fact that many other captains of tugs went down in what the record shows to have been nearly a 30-mile blow, calculating that no material increase was indicated before they could return. Had the captain had larger experience with the boat —he was only in command a few days—or if the evidence showed that the boat herself had successfully dealt with conditions such as she encountered within the four hours after dumping, we might

have reached a different conclusion; but, on the case as it stands, we are not persuaded to disturb the finding of the District Judge that in going down she should have expected to meet conditions with which she was not powerful enough to contend.

In one particular, however, we do not concur. After the towing line parted, the Williams turned back to rescue the crews of the dumper. They were taken aboard by a heavy line; each man jumping overboard, since the conditions of wind and sea made it impossible to get near enough to the drifting dumpers to save them otherwise. Subsequently, when the tug Ivins, which had been sent to rescue the flotilla, came down, it sent a line aboard No. 8 by its mate, Cassidy, the single volunteer for a highly dangerous service; the weather being severe, and the dumpers coated with ice. It was thought that this would secure both tugs, which were supposed to be still connected by an 80-fathom hawser. That hawser had been cut, and in consequence only No. 8 was saved; No. 9 drifting out to sea and becoming a total loss. The district judge found that:

"Before those on No. 9 left her, the hawsers between the dumpers were cut by the men on No. 9 under orders from the master of the tug."·

The evidence on this branch of the case is as follows:

Jacobson, one of the men on No. 9, called by libelant, testified on the direct:

"Q. What became of that? A. That hawser parted. Q. Was it parted, or did you cut it? A. I guess it parted. I have forgotten about that. Q. Don't you know you cut it? A. No; I don't recollect that. Q. Didn't you make a statement that you cut it? A. I don't know. Q. Wasn't it true, if you did say that? A. I guess it was. If you put it in the statement, it was true. Q. Don't you know you told me you cut that hawser; the captain of the tug told you to do it? A. I guess I did. Q. But you don't remember you cut that hawser? A. Yes."

On cross-examination he was asked if he had not made an affidavit that the hawser between the two dumpers parted, to which he replied: "Either parted or I cut it. I have forgotten all about that now." On redirect he "remembered that I had an axe, but don't remember what I did with it." The affidavit referred to, made soon after the accident, was put in evidence. It stated that right after the parting of the towing hawser "the hawser between the two tugs parted," and makes no reference to any cutting. The other man on No. 9, called by libelant, testified that the hawser between the two dumpers "parted or was cut. That I couldn't tell exactly. Q. Don't you know it was cut? A. I don't know if it was cut. I don't know that. Q. Did you have an axe? A. No, sir. Q. Did you see your captain have an axe? A. No, sir. Q. You saw no axe in use at all? A. No, sir." Neither of these witnesses testified to any order from the Williams to cut the hawser from No. 9. The captain of the tug testified that he thought the hawser between the tugs parted when he was going up to rescue the men on the second tug; that he could not say whether it was cut or not; and stated positively that he did not request anybody on board the dumpers to cut it, nor did he have anything to say to any man on either dumper with reference to it. The mate of the tug testified to the same effect.

Cassidy, the volunteer from the rescuing tug, Ivins, who boarded
No. 8, testified that he found the bridle on No. 8, to which the haw-
ser between the two dumpers was attached, "cut off right aft of the
chocks; both bridles cut off; no hawser there." No one was called
from No. 8. The proof does not warrant a finding that the coupling
hawser was cut on No. 9, and there is not a scintilla of evidence
that it was cut on either dumper by the orders or on the suggestion
of any one on the Williams.

The decree of the District Court is affirmed, with interest and
costs of this appeal.