THE GEORGE HUGHES.

(Circuit Court of Appeals, Second Circuit. November 14, 1910.)

No. 19.

1. TOWAGE (§ 11*)—DUTIES AND LIABILITIES OF TUG—CARE AND SKILL REQUIRED.

A towing tug, although not required to exercise the highest degree of skill and care, is responsible for an accident due to want of proper knowledge on the part of her master of the difficulties surrounding navigation in the waters in which she operates and of the service which she undertakes.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

2. TOWAGE (§ 11*)—LOSS OF TOW—LIABILITY OF TUG.

A tug, towing two scows to the dumping ground at night, held not liable for the loss of one, which broke adrift owing to unusually heavy ground swells, and stranded on the beach three hours later: it appearing that the master discovered the loss within a reasonable time and made every effort, which in his judgment was safe and proper, to rescue the scow before she reached the shore.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by the Morris & Cumings Dredging Company against the steamtug George Hughes. Decree for respondent, and libelant appeals. Affirmed.

Armstrong & Brown (Pierre M. Brown, of counsel), for appellant.

Wallace, Butler & Brown (James K. Symmers, of counsel), for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. On the evening of June 19, 1906, the tug George Hughes left New York, having in tow the mud scows No. 40 and No. 36, bound for the dumping ground about two miles southeast of the Scotland Lightship. The scow No. 36 was at the tail of the tow. Between 1:30 and 2:10 a. m. of the 20th, the tug reached a point about three-quarters of a mile from the Lightship when, as a result of unusually heavy ground swells, the rear scow, No. 36, broke adrift and went on the beach some three hours later.

The libelant charges negligence, first, because the tug did not discover that No. 36 had broken away until some time after the event, and, second, because after the discovery of the loss, the tug did not take the necessary steps to rescue the tow, which drifted a distance of about three miles towards the beach and finally went ashore there.

Undoubtedly, if the tug, knowing that the scow was adrift, failed to rescue her in three hours while she drifted slowly towards destruction, a strong presumption of carelessness and neglect would arise. Indeed, the argument of the libelant leads to the conclusion that the master of the tug was either grossly incompetent or criminally negligent. When, however, it is remembered that his own position and reputation were at stake and that every consideration, founded alike upon humanity and expediency, required that he should save the scow, if possible, it would be unsafe to find negligence against the master of the tug, based upon the mere lapse of time. The question is, has the tug fairly and reasonably accounted for the time between the breaking away of the scow and her stranding on the beach? The tug was neither an insurer nor a common carrier. She was bound to exercise reasonable skill and care and is liable for failure in this respect. Though not required to exercise the highest degree of skill and care, she is responsible for an accident due to want of proper knowledge on the part of her master of the difficulties surrounding navigation in the waters in which she operates and of the service which she undertakes. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Lady Pike, 21 Wall. 1, 22 L. Ed. 499.

If, then, it appears that the master of the Hughes, when confronted with the complicated problems disclosed by the proofs, exercised his best judgment and navigated with due regard to all the perils surrounding him, we cannot hold the tug liable, even though it should now appear, in the light of subsequent events, that a wiser course might have been adopted. If he did all that a prudent navigator should have done, the tug is not liable.

The accident happened at night and the testimony comes from witnesses, occupying widely varying positions on land and sea, who speak of events which occurred during a long period of time, approximately three hours. It is not surprising, therefore, that there should be disagreement among the witnesses and confusion in the testimony. We think, however, that the following propositions are established or that they are supported by sufficient testimony to warrant us in upholding the findings of the district judge, who saw and heard the witnesses:

First. The tide was flood, the wind N. E. and there was a heavy ground swell rolling on the beach.

Second. The master of the tug discovered the breaking away of the No. 36 within a reasonable time after it occurred and immediately took measures to rescue the scow.

Third. He owed the same duty to No. 40 as to No. 36 and would not have been justified in abandoning the former in order to rescue the latter. Good seamanship demanded that he should hold on to No. 40.

Fourth. No. 40 was loaded, and in order to overtake No. 36, which was drifting towards the beach, it was necessary to dump the former; otherwise it might have been impossible to overtake No. 36, which had dumped her own load and was standing high in the water, offering a broad surface to the wind.

Fifth. Considerable time was lost in waking the scowman on No. 40, who was the only person who could dump her pockets. In turning around while loaded one of her bridles broke, leaving the tug fastened by the other bridle to the port corner of the scow. Towing under such conditions would be difficult at all times, but with a heavy following sea which caused the scow to sheer and surge violently and with the long hawser trailing behind, it was an exceedingly hazardous operation, requiring the utmost care on the part of the tug and preventing fast progress through the water.

Sixth. There were several other tugs and tows in the immediate vicinity, some of them being between the Hughes and the shore. The tug was therefore compelled to wait until these tugs and tows passed on and thus lost valuable time at the crucial moment.

Seventh. No. 36 drifted over the "oil spot," where, on account of her greater draft, the tug could not follow. She did not abandon the scow, however, at this point, but stood by to the north of the "oil spot," hoping to head the scow off before she stranded.

We cannot find the tug liable in these circumstances; apparently she did what she could to avert disaster, or, at least, we are justified in finding that her master, who was an experienced tugboat man, exercised his best judgment in an unusual and trying situation, pursued as he was by a series of unexpected misfortunes which might have perplexed a most experienced navigator.

The decree is affirmed with costs.