GILCHRIST TRANSP. CO. v. GREAT LAKES TOWING CO. (four cases).

FRANKLIN TRANSP. CO. v. SAME.

(District Court, D. New Jersey. October 16, 1916.)

1. TOWAGE ⬅️11(1)—RELATION AND DUTIES OF TUG TO TOW.
    The general rule respecting the duty and liability of one undertaking towing service is that he is not an insurer, nor required to use the highest possible degree of skill and care, but is bound to exercise reasonable skill and care in everything relating to the work undertaken.
    [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11, 14, 16, 21; Dec. Dig. ⬅️11(1).]

2. TOWAGE ⬅️15(2)—SUIT FOR INJURY TO TOW—BURDEN OF PROOF.
    While the burden is on the one who asserts negligence to prove it, and ordinarily the mere fact that a tow has been injured does not raise a presumption of negligence on the part of the tug, still the mere occurrence of an injury may under some circumstances raise a presumption of negligence and cast the burden of proof on the tug.
    [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 34–36; Dec. Dig. ⬅️15(2).]

3. TOWAGE ⬅️11(1)—RELATION AND DUTIES OF TUG TO TOW.
    A tug in her home waters is chargeable with knowledge of the ordinary currents and tides, channels, depth of water, and well-known obstructions.
    [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11, 14, 16, 21; Dec. Dig. ⬅️11(1).]

4. TOWAGE ⬅️11(1)—RELATION AND DUTIES OF TUG TO TOW.
    A tug impliedly warrants that she has sufficient power and ability to perform the service which is to be undertaken under conditions which are to be reasonably anticipated.
    [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11, 14, 16, 21; Dec. Dig. ⬅️11(1).]

5. TOWAGE ⬅️11(3)—RELATION AND DUTIES OF TUG TO TOW.
    A tug is required to know under the conditions then prevailing or reasonably to be expected, whether it is safe to make the proposed venture, although a mere mistake in judgment in such respect is not sufficient to charge her with negligence; but the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made.
    [Ed. Note.—For other cases, see Towage, Cent. Dig. § 13; Dec. Dig. ⬅️11(3).]

6. TOWAGE ⬅️11(7)—INJURY TO TOW—NEGLIGENCE OF TUGS—COLLISION WITH BRIDGE PIER.
    Two of respondent's tugs belonging to the port of Chicago undertook to move a large ship of libelant, which was without motive power, from the South branch to the North branch of Chicago river. Owing to the

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

southerly current they were unable to take her through the draw of the Washington Street bridge and were obliged to obtain assistance. When they reached the Lake Street bridge, and attempted to pass through the westerly draw, her starboard bow was struck by the current from the main river to the eastward, and was forced against the west pier and injured. *Held*, that the tugs were in fault and liable for the injury, in that they were without sufficient power to safely handle the tow under the conditions, which were not shown to be unusual, and should have known such fact.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 19; Dec. Dig. ☜11(7).]

7. TOWAGE ☜15(2)—INJURY TO TOW—FAULT OF TUGS.
Injury to a large steamer while being moved by tugs from a slip in Chicago river, by striking her stern against a pier on the opposite side of the river, *held* on the evidence not due to the fault of the tugs, but to the failure of the master to make fast a checking line to the pier as directed.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 34–36; Dec. Dig. ☜15(2).]

8. TOWAGE ☜11(6)—INJURY TO TOW—FAULT OF TUGS.
Two tugs towing a large steamship, at the time without motive power, from Milwaukee to Chicago, *held* in fault and liable for allowing her to drift into collision with another anchored vessel off Chicago harbor, while they were changing from lake to harbor lines.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 18; Dec. Dig. ☜11(6).]

9. TOWAGE ☜15(2)—SUIT FOR INJURY TO TOW—DEFENSES—INEVITABLE ACCIDENT.
A tug, which relies on inevitable accident as a defense to a suit for injury to her tow, must show what the cause of the injury was, or all possible causes, and in either case that the result was inevitable, in the sense that it occurred in spite of everything that nautical skill, care, and precaution could do.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 34–36; Dec. Dig. ☜15(2).]

10. TOWAGE ☜11(5)—INJURY TO TOW—FAULT OF TUG.
The grounding of a barge while being towed from Erie harbor, and after she had reached a point outside the piers, *held* due to inevitable accident, for which the tug was not liable, in that the wind suddenly changed in direction and materially in velocity, and with the current thereby caused drove the barge against the side of the channel, although the tug under usual conditions was fully able to handle it.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 17; Dec. Dig. ☜11(5).]

In Admiralty. Four suits by the Gilchrist Transportation Company and one by the Franklin Transportation Company against the Great Lakes Towing Company. On final hearing. Decree for libelant Gilchrist Transportation Company in actions Nos. 1 and 3; other libels dismissed.

Oscar D. Duncan, of New York City, for libelants.
H. D. Goulder, of Cleveland, Ohio, for respondent.

HAIGHT, District Judge. The Gilchrist Transportation Company instituted four separate suits against the Great Lakes Towing Company to recover damages for injuries claimed to have been suffered by cer-

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

tain of its vessels, due to negligent towage on the part of certain tugs of the respondent. The Franklin Transportation Company likewise instituted a suit against the same respondent to recover damages suffered by it through the same cause. As the general principles applicable to the five cases are the same, the decision of each can be more conveniently announced in a single opinion, although it will be necessary to discuss them separately.

[1] The general rule respecting the duty and liability of one undertaking towage service for another is that the former is bound to exercise reasonable skill and care—that which prudent navigators usually employ in similar services—in everything relating to the work which has been undertaken, until it is accomplished, and is responsible for any damages which may result to the tow as a result of the failure to perform that duty; he is not an insurer, nor required to use the highest possible degree of skill and care. The Webb, 14 Wall. 406, 20 L. Ed. 774; The Margaret, 94 U. S. 494, 24 L. Ed. 146; The J. P. Donaldson, 167 U. S. 599, 603, 17 Sup. Ct. 951, 42 L. Ed. 292.

[2] While the burden is on the one who asserts negligence to prove it, and, ordinarily, the mere fact that the tow has been injured does not raise the presumption that the tug has been negligent (The J. P. Donaldson, supra), still the mere happening of an accident may, under some circumstances, raise a presumption of negligence, and cast upon the tug the burden of demonstrating that it was not due to any failure of duty on her part, such as that the accident was one of those inevitable occurrences for which no one is to blame (The Webb, supra, 14 Wall. 414, 20 L. Ed. 774; Vessel Owners' Towing Co. v. Wilson, 63 Fed. 626, 11 C. C. A. 366 [C. C. A. 7th Cir.]; The W. G. Mason, 142 Fed. 913, 74 C. C. A. 83 [C. C. A. 2d Cir.], and cases there cited; The Marie Palmer, 191 Fed. 79 [D. C. Ga.], and cases there cited). The courts have announced various rules which serve as guides for determining whether, in a given case, a tug has performed the duty thus cast upon her.

[3-5] Three of such rules are pertinent to two of the suits at bar, viz.: (1) A tug, in her home waters at any rate, is chargeable with knowledge of the ordinary currents and tides, the channels, depth of water, and well-known obstructions. The Margaret, supra; The T. J. Schuyler v. The Isaac H. Tillyer, 41 Fed. 477 (C. C. E. D. Pa.); Vessel Owners' Towing Co. v. Wilson, supra, and cases there cited; The George Hughes, 183 Fed. 211, 105 C. C. A. 643 (C. C. A. 2d Cir.); The Marie Palmer, supra. (2) She impliedly warrants that she has sufficient power and ability to perform the service which is to be undertaken, under conditions which are to be reasonably anticipated. Dunn v. The Young America, Fed. Cas. 4,178 (D. C. E. D. Pa.); The E. T. Williams, 126 Fed. 871 (D. C. S. D. N. Y.), affirmed 139 Fed. 231, 71 C. C. A. 357 (C. C. A. 2d Cir.); The J. S. T. Stranahan, 151 Fed. 364 (D. C. S. D. N. Y.), affirmed 165 Fed. 439, 91 C. C. A. 493 (C. C. A. 2d Cir.); The Startle, 115 Fed. 555, 560, 561 (D. C. Del.). (3) And she is also required to know whether, under the conditions then prevailing or reasonably to be expected, it is safe to make the proposed venture, whatever it may be. The Margaret, supra; The

T. J. Schuyler v. The Isaac H. Tillyer, supra; Vessel Owners' Towing Co. v. Wilson, supra; The J. S. T. Stranahan, supra; The George Hughes, supra; The Nannie Lamberton, 79 Fed. 121 (D. C. S. D. N. Y.); The Allie and Evie (D. C.) 24 Fed. 745, 748 (D. C. S. D. N. Y.). However, a mere mistake in judgment in this latter respect is not sufficient to charge her with negligence, but the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made. The Startle, supra, 115 Fed. 564; The Allie and Evie, supra. The latter of these rules is, to a great extent, the necessary result of and intimately connected with the first two, but in connection with them requires in all cases, as they do not necessarily, the taking into account of the condition of winds and weather. It follows from these rules that if, in any given case, an accident can be attributed to a lack of knowledge on the part of a tug of any of the things which it is required to know, as above stated, or, with the limitation before mentioned, to the inadequacy of the tug to perform the service she has undertaken, then she has not fulfilled her full measure of duty to the tow. Each case at bar will now be separately considered in the light of these general principles and rules.

[6] 1. What has been termed by the parties as action No. 1 has to do with an injury claimed to have been sustained by the Gilchrist Transportation Company's ship Neptune on the 25th of April, 1912, while in tow of two of respondent's tugs. On the day preceding the accident the tugs, at the libelant's request, and pursuant to a season contract for towage, undertook to move her from the place where she was lying in the South branch of the Chicago river to a point in the North branch. She was without motive power, steering gear, or a crew, except six or seven men used for the purpose of working the hatches, handling the lines, loading, etc. At the time the towage service was undertaken, therefore, she was completely within the control of the tugs and dependent upon them for guidance and movement. The first day she was towed to the Washington Street bridge in the South branch, but the tugs were unable to pull her through that day. However, with the assistance of two other tugs, they succeeded in doing so on the following day. She also passed safely through another bridge, but in attempting to pull her through the Lake Street bridge her port bow collided with the westerly stone abutment of the bridge. As a result she was more or less damaged, the extent being a matter of considerable conflict in the evidence. The main (north and south) branches of the Chicago river meet at about where the last-mentioned bridge is located. Owing to a drainage canal, the water of the Chicago river does not flow, as would be natural, towards the lake and in the same direction in which the vessel was being towed, but in the opposite direction. Consequently, when the boat and the tugs reached the Lake Street bridge, they were confronted with an opposing current, which caught the vessel on her starboard side.

The libelant's version of the accident, which is supported by two witnesses (the captain in charge of the libelant's boats and the shipkeeper of this particular vessel), is that the vessel first struck on her starboard bow against the center abutment of the bridge (the bridge

being of the swinging draw type); that this abutment was protected by loose spiling, and consequently no damage was done by such collision, but that the effect thereof was to cause the vessel to sheer off and her port bow to collide with the westerly stone abutment, which was not protected with spiling. Respondent, on the other hand, contends, and in this it is supported by the testimony of three witnesses (the captains of the respective tugs and the respondent's general superintendent), that the vessel did not at any time collide with the center abutment of the bridge, and, consequently, did not strike the stone abutment by reason thereof, but that she hit the latter in the first instance, and that the accident was due to the fact that, as she reached the bridge, the full force of the current flowing from the main branch of the river into the South branch caught her on her starboard bow, the effect of which, owing to her size and the narrowness of the draw, was inevitably to force her in the opposite direction to such an extent that, although both tugs did all that they could, they were unable to prevent her from colliding on her port side with the westerly abutment.

If the libelant's version is the correct one, it would seem to follow, from the mere happening of the accident, without further proof as to any particular negligent act, that there was a failure to exercise reasonable skill and care on the part of the tugs, because, considering that the effect of the current was to push the vessel away from the center abutment, such a collision was inexcusable. But I cannot find from the evidence (not having had the benefit of seeing the witnesses personally and hearing them testify) that the vessel ever did strike the center abutment. The burden of so establishing was on the libelant. Three witnesses, who were in quite as advantageous position to see what happened as the libelant's witnesses, if not more so, testified that the vessel never touched the center abutment. It may very well be that in the confusion of the moment libelant's witnesses might have mistaken some other jar for a collision with the center abutment. Nor have I any difficulty in finding that the use of the westerly, rather than the easterly, draw was, under the circumstances, entirely proper. Hence no negligence can be predicated on that act. But, in ascertaining whether the respondent performed its full duty, we are not confined solely to what was done at the time of the accident; but it is proper to inquire whether, in view of the fact that the accident happened in the home port of the tugs, and that the respondent was therefore charged with knowledge in respect to the current, depth of water, size of the draw, and that there was no spiling to protect the stone abutment, it was reasonably safe for only two tugs to attempt to take the libelant's vessel through with the current as it then was, especially in view of what happened at the Washington street bridge. Admittedly this draw had not been used for a vessel of the size of the Neptune, proceeding in the same direction, for a long time, if ever. At any rate, respondent had never attempted to so use it. For all that appears, the current was that which was ordinarily to be expected. Can one under such circumstances, charged with the knowledge before mentioned, be heard to say that the proper degree of care was exercised when the

accident, according to its own version, was the result of the inability of the tugs to resist the force of the ordinary current?

To answer the question in the affirmative would be to nullify the rule that a tug impliedly warrants that it has sufficient power to perform the service which it undertakes under conditions reasonably to be expected, and that it is chargeable with knowledge of the usual currents, and to permit it to take a chance. Of course, some chances must be taken, and the law allows for them; but they do not include the ability of a tug to resist the force of a known current. The fact that the accident happened as respondent claims it did, which I find to be the fact, and that later it was found necessary to use three tugs to pull the vessel through, proves the inability of the two tugs to perform the service which they undertook. I am therefore constrained to find that it was not the exercise of reasonable care for the two tugs to have attempted to make the maneuver alone, and hence that in this case the respondent is responsible, if any damage was done to the vessel. I do not find it necessary at this point of the case to determine the extent of the damage, it being sufficient, for present purposes, to find that some damage was done. This I unhesitatingly do. That the vessel was damaged was not only testified to by both of libelant's witnesses, but admittedly it was brought to respondent's attention very shortly after the accident, and at that time the only controversy was as to the extent. The fact that no survey was made until December, 1912, and that the libel was not filed until March, 1914, was commented upon by respondent's counsel during the course of the argument as indicating that libelants recognized at the time that either no damage was done, or that, if any was done, the respondent was not responsible therefor. While these facts, unexplained, might be a circumstance to be taken into account in weighing the conflict in the evidence regarding the manner in which the accident happened, they have no significance, when it is understood that these suits are being prosecuted for the benefit of those who insured the vessel. If libelant collected insurance for the damage, no unfavorable inference can be drawn from its failure to institute proceedings against a towing company with whom it was continually doing business, and whose good will it undoubtedly coveted. The above criticisms and observations apply, not only to the case now under consideration, but to all of the others. I do not, at this stage of any of the cases, attempt to consider what effect shall be given to the surveys or the extent of the damage.

The libelant is entitled to a decree in this case, with costs. The ascertainment of the damages, as in the other cases in which I find for the respondent, will be referred to a commissioner in the usual way.

[7] 2. Action No. 2 was brought to recover damages for another injury alleged to have been sustained by the Neptune on August 23, 1911, in the Chicago river. Immediately prior to the accident complained of she was lying in a slip alongside of the Union Elevator dock, bow in; her stern protruding, approximately 100 feet beyond the dock, out into the river. The river at that point is between 200 and 225 feet wide. She was without steam or steering gear, and had a crew of about six men to handle the hatches, load, and take care of

the ship at the dock. The respondent's tugs Charnley and Evans undertook to tow her from the slip to another dock a short distance up the river. While engaged in doing so, her stern came in collision with a dock on the other side of the river, at a point almost directly opposite the elevator dock, and it is claimed that by reason thereof she was damaged. The libelant contends that the collision was due to the negligence of the tugs, while it is the respondent's insistment that it was due to the failure of the captain of the vessel to obey the instructions of the tug captains as to keeping a line out on the elevator dock for the purpose of checking the vessel and preventing an accident, such as happened.

Admittedly, the captain of the vessel was instructed, in the first instance, to keep such a line out; he already had one or more attached to spilings on that dock. The captain of the vessel testified, however, that at his suggestion this order was rescinded, and it was understood that the line was to be fastened to a freight dock on the opposite side of the slip; that he accordingly dispatched a man around the slip to the freight shed for the purpose of fastening such a line, but before he could do so the tugs began to pull the vessel out of the slip, and consequently he was unable to get the line fastened before the accident happened. Both of the tugboat captains, on the other hand, testify that the original directions were in no respect altered or countermanded, but that they declined to acquiesce in the suggestion of the captain of the vessel—that the line be run to the freight dock. The length of the vessel, and the narrowness of the river and the slip, required that the stern of the vessel be permitted to go very close indeed to the opposite bank of the river before she could be permitted to swing in the current, and thus assume a position in the river which would make it possible to tow her to her destination. As the vessel had no power herself, it was thus necessary, or at any rate considered so by all concerned, that a line should be run from the vessel to a dock to check her when her stern reached a point a short distance from the opposite bank.

The question of liability, therefore, depends primarily upon whether the original direction, given by the tugboat captains, as to the keeping of a line on the elevator dock was rescinded. If it was not, the accident was undoubtedly due to the failure of the captain of the vessel to obey instructions, unless the fact that he had failed to do so was brought to the attention of the tug captains in sufficient time before the accident to have enabled them, in the exercise of reasonable care and skill, to have avoided the accident. There is no evidence which would justify the finding of the latter. If, on the other hand, the original direction regarding the placing of the lines was rescinded, and it was understood that the line was to be made fast to the freight dock, the tugs were in fault in starting when they did, and in not affording the vessel a reasonable opportunity to run a line. Bearing in mind the burden of proof, I am unable to conclude that the instructions originally given were rescinded. It is, I think, quite improbable that the captains of the tugs, knowing as they did the necessity of a line from the vessel to a dock, would have attempted to move the vessel before an op-

portunity had been afforded the latter to run such a line. I am inclined to believe, upon the whole, that there was a misunderstanding between the tug captains and the captain of the vessel as to where the line was to be placed. But this fact, of course, would not permit the finding of any negligence on the part of the tugs, providing that the captains of the latter had given the necessary instructions, and reasonably believed, as I find they did, that they would be carried out. They did not learn that their instructions were being disobeyed until it was too late.

My conclusion, therefore, is that the tugs were not responsible for this accident, and hence the libel in this case must be dismissed, with costs.

[8] 3. In action No. 3 it is sought to recover the damages claimed to have been sustained by the same steamer, the Neptune, on August 20, 1911, while she was on her way to Chicago harbor, in tow of respondent's tugs Indiana and Morford. She was under the command of the same captain as at the time of the collision of August 23d, and apparently had the same crew. At the time of the occurrence which gave rise to this action she was being towed from Milwaukee to Chicago; her engines were out of commission, and she was completely under the control of the tugs. She reached the Chicago Breakwater between 10 and 11 o'clock in the evening of August 20th, and at a point between the outer crib and the breakwall the tugs proceeded to change from the lake lines (which they had used in towing her from Milwaukee) to harbor lines. This necessitated the drawing in of the lake lines, first from one tug and then the other, and the casting out of the harbor lines. From 1½ to 2 hours were consumed in the former operation. The line which the starboard tug (the Morford) had was first drawn in, and then the line to the port tug (the Indiana). Just about the time that the drawing in of the latter line had been finished, and before the harbor lines had reached either of the tugs, the Neptune collided with another steamer, the Uganda, which was lying at anchor inside the breakwall, and it is claimed sustained damage thereby. Admittedly, the Uganda was seen by the captains of the tugs when the Neptune was at least three-fourths of a mile to the windward of her. The latter, during the time that the lake lines were being taken in, drifted with the wind and the current this intervening three-fourths of a mile. It appears from the testimony of the captain of the Morford that at the time the taking of the line from his tug was finished the Neptune was about one-half mile distant from the Uganda; he then went to the stern of the Neptune and "hollered" for a harbor line, it having been arranged that he was to have the stern line while proceeding up the Chicago river, where the Neptune was to be taken; that he received no response, and, after he had waited "quite a while" he saw that the Neptune was "going down on" the Uganda; that he then went around the vessel to take a position on her port side for the purpose of shoving her off. During practically all of the time that the Neptune was drifting this half mile, the Indiana still had the starboard lake line. No alarm signals, or other effort to warn the captain of the Neptune of the impending danger, were given by either of the

tugs until the captain of the Morford saw that there was likely to be a collision. It was then clearly too late for those on board the Neptune to do anything to avoid the collision.

It seems to me that the evidence of the captain of the Morford clearly charges him with negligence. He says that after the lake line was taken in he waited "quite a while" for the harbor line to be thrown to him. During all of that time the Neptune was drifting in the direction of the Uganda and covered a distance of about a half a mile. This must have taken considerable time, because she drifted altogether about three-fourths of a mile in 1½ to 2 hours. Yet during all of this time the Morford made no effort to shove the Neptune out of the course in which she was drifting, or to get the harbor line, except to "holler"; nor was any effort made by the Indiana to pull her out of the course in which she was drifting. When it is remembered that the vessel was without steam or ability to maneuver herself, and was entirely in the control of the tugs, it is difficult to escape the conclusion that one or both of the latter failed in their duty to take steps in time to avoid the subsequent collision or to notice her danger until it was too late. In either aspect there was clearly, I think, a failure to exercise the reasonable care that was required of them. It may be that the failure of those on the Neptune to cast a harbor line to the Morford was in one aspect a contributing cause of the accident. But there is no evidence, and in fact all is to the contrary, that the requests of the Morford for the harbor line were heard by those on the vessel. But, even if they had been heard and not heeded, this circumstance would not excuse the failure of the tugs to either notice the danger or to take some effective means to have avoided the collision before they did. There were no other circumstances to excuse this apparent neglect on the part of the tugs. The evidence quite conclusively demonstrates, I think, that if an effort had been made in time, and there is no reason why it should not have been, except inattention on the part of the tugs, the collision could have been readily avoided.

I therefore find the respondent liable in this case, and the libelant is, accordingly, entitled to a decree, with costs; the ascertainment of damages to be referred to a commissioner.

4. Action No. 4 concerns an injury claimed to have been sustained by the Gilchrist Transportation Company's steamer Lake Shore on January 17, 1912, while in tow of respondent's tugs Dickinson and Field. As in the cases previously discussed, this vessel was without steam and completely under the control of the tugs. She was in charge of a captain, a shipkeeper, and a crew of seven or eight men. At the time towage service was begun she was lying at the dock of the National Elevator Company in the South Chicago river, and was to be towed against the current to the Rock Island elevator, in the same river. When the Pennsylvania or Ft. Wayne bridge was reached the tugs were unable (although two or three attempts were made) to get the vessel through. A further attempt was made on the following day, and was likewise unsuccessful. On January 23d, however, through the use of three tugs and the raising of the depth of the water, and probably the diminishing of the current, the vessel was hauled through and

brought to her point of destination. It is claimed that on the first attempt "she sheered and struck her port bow" against one of the abutments of the bridge, which caused a dent to be made in two of her plates. It is to recover for the damage thus sustained that this action was brought.

I am by no means reasonably convinced, if there was any collision at the time and place in question, that any damage whatever was done. The burden was on the libelant to so demonstrate. The weight of the evidence seems clearly to indicate that the part of the vessel, which the captain first claimed had been damaged, could not have come in contact with any portion of the bridge. In addition, the evidence tends to prove, circumstantially, that the dent was due to another cause, for which the respondent was in no way responsible. While the testimony of the captain of the vessel is positive to the effect that the vessel did strike the abutment of the bridge, he is evidently wrong as to the character of the abutment, and as to the time when he first called the attention of any one connected with the tugs to the alleged damage. If the injury had been done on the first day, it is difficult to understand why some one's attention was not called to it until the 23d. I think probably the correct explanation of the whole affair is that the captain of the vessel did notice a jar of some kind during the first attempt to get the vessel through (which probably was due to the grounding of the vessel, this, undoubtedly, being the cause of the inability of the tugs to pull her through the bridge), and that later, when he reached the dock, he saw the dent and assumed that it was the result of the jar which he had felt on the first day. He then called the attention of respondent's manager to it. This is borne out by the statement, which respondent's witnesses testify he made at that time, to the effect that he did not know whether the tugs caused the dent or not. Upon the whole, the evidence does not justify a finding that any damage, for which the tugs were responsible, was done to the vessel at the time alleged.

It follows, therefore, that the libel in this case must be dismissed, with costs.

5. Action No. 5 was brought by the Franklin Transportation Company to recover the damages claimed to have been sustained as the result of the grounding of its barge Alexander Maitland just outside of the harbor at Erie, Pa., on November 12, 1912, while she was in tow of respondent's tug Buffalo. The barge was 366 feet long, with a beam of 44 feet, and at the time in question drew about 18 feet 6 inches of water, approximately 8 feet of her side being exposed. When the towage service began she was lying at the Susquehanna coal dock within the Erie harbor, without any power of her own. She was to be taken from the harbor to her consort, which was lying outside in the lake. The start was made between 6 and 6:30 p. m. (seventy-fifth meridian time). She was towed out through the channel, which was of amply sufficient depth and width to accommodate a vessel of her dimensions, without incident until she reached a point outside of the piers, which parallel the greater part of the lake end of the channel, when she went aground upon the east bank of the channel.

It is to recover the moneys expended for salvage services in getting her off that this action was brought. It may be noted at the outset that all of such services were rendered by the respondent, and the bills therefor were paid by the libelant shortly thereafter without protest or question. It may well be that under those circumstances such moneys cannot now be recovered; but as the respondent has not raised that question, and as I have reached the conclusion that the libel must be dismissed on another ground, I have not attempted to consider it carefully.

The circumstances of the happening of the accident, as detailed above, would probably, under the rules before mentioned, be sufficient to charge the tug with negligence, without proof of the respect in which she was at fault, and cast upon her the burden of explaining and demonstrating her lack of culpability. But the respondent has undertaken to discharge this burden, and to show that the grounding was one of those inevitable accidents for which no one is responsible. It is claimed on its behalf that, shortly before the tug and tow reached the end of the westerly pier, the wind, which had theretofore been blowing moderately from the southwest, suddenly shifted to the northwest and attained a very high velocity; that it, together with the current produced thereby, drove the barge out of the channel in which she was being towed, and forced her on the easterly bank where she grounded, notwithstanding that every possible effort was made on the part of the tug to prevent it. It is further insisted that the gale, especially in respect to the suddenness with which it arose, was one which could not ordinarily and reasonably have been anticipated. The libelant's proofs suggest primarily that the accident was due to the fault of the tug, either in coming out of the channel at too slow a speed, or because she took a position on the starboard bow of the vessel, or both. But, irrespective of these circumstances, the libelant contends that the gale which arose and the accompanying tide were such as might reasonably have been expected in that place at that time of the year, and consequently, under the rules before mentioned, if the tug was unable to hold the barge in the channel against the wind and the current, it is responsible for its failure to do so.

The weight of the evidence leaves no reasonable doubt, I think, but that the tug was proceeding through the channel at the customary and usual rate of speed. The captain of the tug was experienced, capable, and skillful, and, in the absence of circumstances which, in the exercise of reasonable care, would seem to call for a greater speed, no negligence can be predicated on the fact that he saw fit to travel at the usual rate. Nor, if it be assumed that the tug was towing on the starboard bow, rather than straight ahead, or on the port bow, can that circumstance, under the evidence, be held to constitute negligence. I have no difficulty in finding that the accident was in no respect due to the latter fact alone, or in connection with the rate of speed at which the tug proceeded. Undoubtedly, if it had been foreseen that a wind of the velocity and from the direction as that which subsequently arose was likely to be encountered, the tug would have been better able to prevent the barge grounding, if she

had been going at a greater rate of speed and had been pulling on the port bow. This, I think, is demonstrated by what she did when the wind arose. But, unless the wind could have been reasonably antici-pated, I fail to see how either the rate of the speed or the position of the tug, which in themselves were entirely proper for ordinary conditions, can be held to be the proximate cause of the accident.

[9] The respondent having relied upon an inevitable accident, it was incumbent upon it to show what the cause of the grounding was, and that the result of the cause was inevitable, in the sense that it occurred in spite of everything that nautical skill, care, and precaution could do (Mabey v. Atkins, 14 Wall. 204, 20 L. Ed. 881; The Morning Light, 2 Wall. 550; Union Steamship Co. v. N. Y. & Va. Steamship Co., 24 How. 307, 16 L. Ed. 699), or to show all possible causes and as to all such that the result was inevitable in the sense before mentioned (The Merchant Prince, L. R. Probate Division 179; The Olympia, 61 Fed. 120, 9 C. C. A. 393 [C. C. A. 6th Cir.]; The Bayonne, 213 Fed. 216, 129 C. C. A. 560 [C. C. A. 2d Cir.]).

[10] The respondent, as before stated, has attempted to show the exact cause, and that the result thereof was inevitable. The decision of the case, therefore, resolves itself into the determination of whether the grounding was caused by the sudden change and violence of the wind and the current, and, if so, whether they were such as could not have reasonably been expected, and against the force of which the tug, in the exercise of due care and skill, could not prevail. The evidence leaves no doubt in my mind but that the tug was, under ordinary conditions, sufficiently powerful and in every way adequate to perform the service which she undertook, and that, although she was properly and skillfully handled, it was impossible for her to prevent the accident, because of the violence of the wind and current which then prevailed. It is not disputed that, shortly before or at about the time the tug and the barge arrived outside of the pier, the wind, which had been blowing from the southwest, shifted to the northwest. Although there is some conflict in the evidence, I am forced to the conclusion that the change in the wind was not only very sudden, but that its velocity was increased very materially, and as a result thereof a decided current set in. The combination undoubtedly drove or caused the barge to veer towards and ground upon the easterly bank of the channel. I have no hesitancy in finding, therefore, that the cause of the accident was the sudden changing of the wind and the current, and the velocity which they attained, and hence that the accident was inevitable, unless the cause could reasonably have been anticipated.

It remains, therefore, to consider whether it could have been. If it could, the accident cannot be said to have been inevitable or un-avoidable; for in that case it would have been negligent either to set out upon a voyage which the tug was incapable of successfully completing, or in proceeding at the slow speed which it did and taking a position to the starboard of the vessel's bow. The determination of this question necessitates the ascertainment of what the weather conditions were at the time the vessels left the dock and during the

time which elapsed before the squall arose. The accident happened at about 7:30, so that there was an intervening period of time of from 1 to 1½ hours. On this latter point there is also an unfortunate conflict in the evidence, but I think I must find that there was nothing in the weather conditions prior to the time the tug reached the lighthouse, near the end of the pier, which would in any way indicate the likelihood of a change of wind or a squall of the suddenness and velocity of that which subsequently arose. In addition to the testimony of at least two disinterested witnesses, who were in a position to take note of weather conditions and by experience were quite capable of doing so, the government weather charts, offered by the libelant, show that the wind was not only blowing from the southwest during all of the time intervening between the beginning of the voyage and the happening of the accident, at a comparatively low velocity, but that, at about the time the boats reached the end of the pier, it shifted suddenly and without previous warning to the west and northwest and increased very materially in velocity. When it is considered that the respondent's witnesses were estimating, I think it quite remarkable that their estimates so nearly correspond with the accurate figures of the government. According to the latter, at 7:42 p. m. the wind blew from the northwest at the rate of 34 miles an hour, at 7:40 p. m. at the rate of 30 miles an hour, and from 7:25 to 7:35 at the rate of 27 miles an hour, while at 7:20 it was blowing in a southwesterly direction at the rate of 17 miles an hour.

It is true that nearly all of the witnesses testify that windy weather and squalls, of greater or less degree, occur around Erie during the fall of the year, and the government records for a number of years back show maximum wind velocities, at that point, during the month of November, equal to or in excess of that which prevailed at the time of this accident. But the mere fact that during a certain month of the year winds of high velocity occur and are to be expected from time to time falls far short of proving that a shift of wind of the suddenness of that in question and a squall of its magnitude could reasonably have been anticipated as likely to occur when this tug set out on its short voyage, or, for that matter, during the progress thereof, if the previous and then condition of the weather gave no indication thereof. To hold that a tug, under such circumstances, must anticipate such sudden and violent changes, would be tantamount to casting upon it the obligation of an insurer. The decisive inquiry is not alone whether violent winds were likely to arise at that time of year, but whether, in view of the then or previous state of the weather, taken in connection, of course, with the time of the year, they could be reasonably expected. When the case is considered in this light, there is no evidence to justify the finding that the wind and current could reasonably have been anticipated at any time before it was too late to guard against them. As, therefore, the gale and the attendant current were the proximate cause of the accident, and could not reasonably have been anticipated by those in charge of the tug at any time after the beginning of the voyage and before it was too late to avoid their effect, and hence that there was no negligence

in embarking upon the voyage, it follows that the grounding of the vessel was the result of an inevitable accident, for which the respondent is not liable.

It follows, therefore, that the libel in this case must be dismissed, with costs.